A10A0827. KITCHEN et al. v. HART et al.
(704 SE2d 452)

SMITH, Presiding Judge.

In this legal malpractice action, Charlotte and Harry Kitchen appeal from the trial court's order entering summary judgment in favor of defendants R. Jonathan Hart and Lee, Black, Hart & Rouse, P. C. (collectively "Hart"). The Kitchens contend the trial court erred in concluding that they suffered no damages as a proximate result of Hart's alleged negligence and in applying the "read or perish" rule to a portion of their claim against Hart. For the reasons set forth below, we affirm.

> On appeal from the grant of summary judgment this [c]ourt conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citation and punctuation omitted.) *Cox Enterprises v. Nix*, 274 Ga. 801, 804 (2) (560 SE2d 650) (2002). In this case, we adopt the following portions of the outline of relevant facts contained in the trial court's orders:[1]

> This matter stems from a contract to buy two companies which were part of a group of companies known as the Adams Group. These companies were involved in the business of constructing, renovating, and/or interior designing commercial properties. Plaintiffs are real estate developers. . . . Mr. Kitchen was contacted by Stephen Adams, shareholder of The Adams Group companies. Mr. Adams sought to ascertain Mr. Kitchen's interest in investing in MSA and Parker and becoming a co-owner of those companies. In exchange for his financial investment, Mr. Kitchen was to receive one-third interest in MSA and Parker. . . .

---

[1] The trial court initially granted summary judgment on November 2, 2005, but subsequently rescinded it because it failed to address all of the Kitchens' arguments. On February 9, 2009, it granted summary judgment again and incorporated by reference facts set forth in its initial order.

[D]uring an all day meeting, the final terms of the deal were solidified. SunTrust Bank served as the lender and was represented by its attorney. Defendant Hart served as legal counsel for Plaintiffs, Anthony Adams, Sr., John McEachern, Steven Adams, MSA, Parker, Foxfield and Adams Construction. Plaintiffs were aware that Defendant Hart represented multiple parties in the subject transaction. No conflict of interest waiver was signed.

The deal basically involved three loans that totaled $3,600,000. SunTrust loaned $2,700,000 to Plaintiffs, Anthony Adams, Sr. and John McEachern combined. All four of those obligors, including Plaintiffs, signed a promissory note on a $2.7 million loan, making them jointly and severally liable for the entire loan amount. Under a separate note, the same four individuals borrowed $600,000. That note was guaranteed and collateralized in the same way as the $2.7 million loan. The third loan, in the amount of $300,000, was made to Adams Acquisition, Inc. Plaintiffs each executed unlimited, unconditional, personal guarantees for that loan, as well as a separate limited guaranty by their company Foxfield. Finally, Plaintiffs executed, along with their co-borrowers, a Cross Default and Cross Collateralization Agreement binding them and their collateral under all three of the notes.

As it relates to Plaintiffs' portion of the collateral, Mr. Kitchen deposed that SunTrust loaned Plaintiffs $950,000 to purchase a certificate of deposit. According to Mr. Kitchen, after the closing, Plaintiffs' company, Foxfield, was to purchase 2.2 acres of property. Once that property was purchased, the $950,000 certificate of deposit would be replaced by the 2.2 acres. Thus, Plaintiffs' portion of the collateral was the certificate of deposit which would be later substituted for the 2.2 acres. According to Mr. Kitchen, the 2.2 acres was worth approximately $950,000. Mr. Kitchen deposed, "that is how we came up with $950,000. It's roughly a third of the obligation."

The parties dispute whether Plaintiffs were suppose[d] to be jointly and severally liable for the entire loan amount or just $950,000, allegedly one-third of the loan. When asked to explain how $950,000 equates to one-third of the loan obligation, Mr. Kitchen deposed that he started with a loan amount of $3.3 million (which excludes the $300,000 loan to Adams Acquisition for which Plaintiffs signed guarantees). According to Mr. Kitchen, "if you subtract the amounts due from the IRS refund and the supposed small

amount of equity in the value of the option property, then you can work back to a number that's roughly a third." However, Mr. Kitchen deposed that he understood the notes were going to be $2,700,000, $600,000, and $300,000. Additionally, there is no evidence in the record as to whether the IRS refund was received and the amount, if any. Nor is there any evidence regarding the amount, if any, of "the supposed small amount of equity in the value of the option."

Plaintiffs deposed that they did not read the loan documents. Mr. Kitchen testified that he relied on his attorney Defendant Hart to effectuate his desire to be limited to one-third of the loan amount. Mrs. Kitchen deposed that she did not look at any of the documents before signing because, "I was signing quickly because my children were in the car." Mrs. Kitchen explained that no one prevented her from looking at the documents. Mrs. Kitchen testified that she was informed that the documents needed to be signed that day but that no one fully explained to her the details of what she was signing.

As it relates to Mr. McEachern's collateral, a security interest was obtained by SunTrust on Mr. McEachern's home. On the morning of the closing, Mr. McEachern and his wife executed an affidavit averring that the title on their home was free and clear of any encumbrance. Mr. Kitchen deposed that he watched Mr. McEachern and his wife sign the affidavit. Additionally, on the day of the closing, around 10:00 a.m., a title update was conducted on the McEacherns' home and no liens were detected. Approximately one year later, SunTrust discovered that Wachovia Bank held a superior security interest on the property. It was later discovered that the Wachovia security interest was filed at 10:47 a.m., approximately two hours prior to the July 13, closing.

On or about May 12, 2000, in an effort to increase the profitability of MSA and Parker, Plaintiffs reached agreements with both Mr. McEachern and Mr. Adams, whereby Plaintiffs would purchase the stock interest of Mr. McEachern and Mr. Adams in MSA and Parker. The agreement provided that Mr. McEachern and Mr. Adams would convey their stock in the companies to Plaintiffs. In exchange, Plaintiffs agreed to, among other things, "indemnify and hold harmless Seller from any claim by SunTrust Bank Savannah, N.A. . . [.]" In addition, Plaintiffs would pay Mr. McEachern and Mr. Adams periodic cash payments totaling one million dollars each in consulting fees. A condition precedent to the transaction required, "the fulfillment and

satisfaction at the time of closing and the obtaining of a release of the Seller of certain promissory notes, real estate, personal collateral, and personal guarantees . . . ." Defendant Hart drafted the stock purchase agreements. SunTrust did not agree to the proposed releases. On July 7, 2000, Plaintiffs sued Mr. Adams and Mr. McEachern to try to enforce the agreements claiming that the contract was valid despite the failure to obtain the releases from SunTrust.

In the spring or summer of 2000, potentially while the lawsuit against Mr. Adams and Mr. McEachern was in progress, Mrs. Kitchen was informed by Mr. McEachern and his attorney that the collateral pledged by Mr. McEachern, i.e., his home, was previously encumbered by a Wachovia Bank security interest and potentially a $100,000 loan from Mr. McEachern's father. Mrs. Kitchen deposed that she then informed SunTrust that the Wachovia security interest was superior.

Trial court's November 2, 2005 order, pp. 2-7.

Mr. Kitchen testified that if he had gained control of the companies as planned, he "would have taken my business expertise and try to increase the — you know, expand the scope of MSA as to the tenants that we were representing, and to go to Atlanta and roll my sleeves up and try to expand the role of Parker." In addition, the Plaintiffs testified that they also sought control of the companies because they were personal guarantors of several bonds on Dollar General projects and were concerned about their liability for those bonds.

Trial court's February 9, 2009 order, p. 3.

On or about November 7, 2000, Plaintiffs settled their lawsuit against Mr. McEachern by renegotiating the buyout agreement. The settlement was not drafted by Defendant Hart. According to the agreement, Mr. McEachern agreed to convey to Plaintiffs all of his ownership interests in MSA and Parker, Plaintiffs *again* agreed to indemnify and hold Mr. McEachern harmless from all claims by SunTrust for any of the obligations under the July 13, 1999, loans. Although the settlement contained language whereby Plaintiffs agreed to exercise, "their best efforts to obtain a release for Mr. McEachern . . . from SunTrust Bank . . . in connection with the July 13, 1999, closing . . . ," this re-

quirement was not characterized as a condition precedent as was the case in the first contract. Plaintiffs testified that before entering into this agreement, they were aware that Mr. McEachern was jointly and severally liable for all of the July 13, 1999, loans. Mr. Kitchen deposed that under the new contract, as it relates to Mr. McEachern, he saved a million dollars from what the May 12, 2000, agreement contemplated.

Shortly after the purchase of Mr. McEachern's interest in MSA and Parker, the companies began to fail and the original July 13, 1999, loans went into default. Thereafter, Plaintiffs tendered $950,000 to SunTrust which Plaintiffs state[d] was their one-third obligation under the loans. SunTrust did not accept the amount offered. . . . The parties eventually settled the matter for $2,900,000. Plaintiffs contributed $2,100,000 to the settlement and Mr. Adams, who was also jointly and severally liable for the entire loan amounts, only contributed $800,000.

Plaintiffs have brought this action alleging negligence and breach of fiduciary duty against Defendants. Defendants do not dispute that an attorney/client relationship existed between Plaintiffs and Defendant Hart. Also, Defendants do not dispute that a written conflict of interest waiver was not provided to Plaintiffs.

Trial court's November 2, 2005 order, pp. 7-9.

The Plaintiffs allege that they were damaged by the failure of the stock purchase agreements:

Q. Do you believe that you were harmed by the failure of the stock purchase agreement that would have acquired the ownership interest of McEachern and Tony Adams in return for assuming their obligations under the notes and payment of a million dollars each?

A. Absolutely.

Q. And why do you think that?

A. Titan Construction was formed, and it's still doing business and very successfully with the tenants that we were working with at the time. We basically shut down, and they took all of our business in Savannah.

Q. And Titan was composed of Anthony Adams, Steve Adams' wife, and Beeson who had worked with MSA before?

A. Yes.

Q. So what reason do you have to believe that MSA could have competed successfully against those people?

A. We wouldn't have competed with those people. Grant Beeson was our employee when the company shut down. Then him and Steve Adams and Tony Adams went on and formed a new entity.

. . .

Q. What tenants of MSA are now doing work with Titan?
A. I have no idea today.
Q. Well, the vast majority of MSA's business was construction of the Dollar stores, wasn't it?
A. Build to suit for retail tenants, yes.
Q. And what proportion of those retail tenants were Dollar stores?
A. Seventy-five percent.
Q. And Dollar stores ended that program right about the time the company failed, didn't it?
A. They ended it in November [2000], yes.

. . .

Q. Can you tell me how much money you would have made with MSA not building Dollar stores had you acquired the complete ownership of the company in this exchange for —
A. No.

It is undisputed that after the stock purchase agreements failed, Grant Beeson left MSA. It is further undisputed that Dollar General was MSA's primary client and that Dollar General eventually cut back its programs and work with MSA. However, the record is ambiguous about precisely when Dollar General cut back and then eventually cut off its work with MSA.[2]

Plaintiffs seek damages for the lost profits of MSA as a result of the [Defendants'] alleged malpractice. In support of this argument, the Plaintiffs offer information on the history of MSA. According to the Affidavit of M. Stephen Adams, MSA was formed in 1997. The affidavit further provides, "As of July 1999, MSA had completed approximately 20 Dollar General Stores, MSA also had approximately another 20 stores under construction. By this time, MSA was grossing over $5 million dollars and had a backlog of over $5 million." In support of this statement, a March 31, 1999 copy of MSA's balance sheet, operating statement, and percentage to com-

---

[2] The record shows that Dollar General began its cut backs in the second half of 2000.

plete reports was attached to the affidavit. The operating statement shows that MSA earned a total income of $2,477,081 from April 1, 1997 to March 31, 1998 and had a net profit of $299,984 for that period. The operating statement further provides that MSA earned a total income of $4,671,780 from April 1, 1998 to March 31, 1999 and made $0 net profit for that time period. The March 31, 1999 percent complete report lists approximately 40 items, all of which appear to be Dollar General construction projects as indicated by the letters "D.G." or the words "Dollar General." The status of these jobs is unclear from the information in the report. Beyond these documents and some limited testimony, there is no further substantive evidence in the record regarding the financial history or status of MSA.

Trial court's February 9, 2009 order, pp. 9-11.

The trial court granted Hart's motion for summary judgment based upon its conclusion that the Kitchens could not show any damages proximately caused by Hart's negligence. It also granted summary judgment in connection with the stock purchase agreements based upon its application of the "read or perish" rule. See *McWhorter, Ltd. v. Irvin*, 154 Ga. App. 89, 91 (2) (267 SE2d 630) (1980); *Kushner v. McLarty*, 165 Ga. App. 400, 401-402 (1) (300 SE2d 531) (1983).

1. The Kitchens assert in this appeal that the trial court erred in granting summary judgment in Hart's favor on damages in connection with their claim that they should have only been liable for one-third of the SunTrust loan. The trial court concluded that "the Plaintiffs' own actions negated any damages they might have suffered from Defendants' alleged negligence" by later voluntarily assuming full responsibility for the SunTrust loan.

To prevail on a legal malpractice claim, a client must prove that (1) he employed the defendant attorney; (2) the attorney failed to exercise ordinary care, skill, and diligence; and (3) this failure was the proximate cause of damages to the client. To establish proximate cause, the client must show that but for the attorney's error, the outcome would have been different; any lesser requirement would invite speculation and conjecture. The defendant attorney is entitled to summary judgment if he shows that there is an absence of proof adduced by the client on the issue of proximate cause.

(Citation and punctuation omitted.) *Kramer v. Yokely*, 291 Ga. App. 375, 379-380 (2) (662 SE2d 208) (2008). We agree with the trial

court's conclusion that the Kitchens' later conduct precludes them from holding Hart responsible for the difference between one-third and full liability for the SunTrust loan. See *Duke Galish, LLC v. Arnall Golden Gregory, LLP*, 288 Ga. App. 75, 75-76 (653 SE2d 791) (2007) (client's settlement severed proximate cause resulting from attorney's alleged negligence).

The Kitchens argue that Hart should still be held accountable for the difference because they assumed liability for the entire debt to mitigate the losses caused by Hart's initial drafting error. We find no merit in this argument because the record shows that the Kitchens' decision to assume responsibility for the entire loan was not made to mitigate losses caused by Hart's alleged malpractice. At the time the Kitchens entered into the voluntary agreement, they believed their obligation was limited to one-third and they had not yet discovered that the closing documents obligated them for the entire amount of the loan.

The Kitchens claim that because their liability for the entire debt might have been voided by any "fraudulent or other willful, intentional conduct" of McEachern, their assumption of full responsibility for the loan should not sever proximate cause with regard to Hart's alleged negligence. The trial court correctly rejected this argument because the record shows that the Kitchens knew the facts surrounding their fraud claim at the time they agreed to assume full responsibility for the loan. See *Pacheco v. Charles Crews Custom Homes*, 289 Ga. App. 773, 775 (1) (658 SE2d 396) (2008) (knowledge of deficiencies precluded fraud claim).

2. The Kitchens also assert that the trial court erred in concluding they failed to establish an issue of fact with regard to lost profits based upon McEachern and Anthony Adams's rescission of the stock purchase agreement. We disagree.

> Ordinarily, anticipated profits are too speculative to be recovered, but where the business has been established, has made profits and there are definite, certain and reasonable data for their ascertainment, and such profits were in the contemplation of the parties at the time of the contract, they may be recovered even though they can not be computed with exact mathematical certainty. Nonetheless, to recover lost profits one must show the probable gain with great specificity as well as expenses incurred in realizing such profits. In short, the gross amount minus expenses equals the amount of recovery.

(Citation, punctuation and footnote omitted.) *KAR Printing v. Pierce*, 276 Ga. App. 511, 512 (623 SE2d 704) (2005).

The trial court correctly concluded in this case that

[t]here is insufficient evidence to show that the companies had a record of profits. There is no expert testimony regarding the financial status of MSA prior to or after the execution of the stock purchase agreements. There is limited fact testimony from any other witnesses on this issue as well. Although the Plaintiffs apparently intend to argue that MSA would be as successful as Titan Construction — the business that MSA's "key employee" Grant Beeson left to work for — there is no information on the record regarding the financial status of Titan Construction, what clients Titan Construction retained from MSA, or even what clients currently employ Titan Construction. . . . The financial information provided, along with the testimony that the Plaintiffs would have used their experience to make MSA successful, falls below the threshold requirement for specificity . . . and . . . the "definite, certain, and reasonable data" required to ascertain lost profits.

3. Based upon our holdings in Divisions 1 and 2, we need not decide whether the trial court erred in its application of the "read or perish" rule.

*Judgment affirmed. Mikell and Adams, JJ., concur.*

DECIDED NOVEMBER 30, 2010.

*Savage, Turner, Pinson & Karsman, Brent J. Savage, Christopher D. Britt*, for appellants.
*Brannen, Searcy & Smith, David R. Smith*, for appellees.