A10A1821. HOWARD v. SELLERS & WARREN, P.C. et al.
(709 SE2d 585)

SMITH, Presiding Judge.

Randy Howard appeals from the trial court's grant of summary judgment to Sellers & Warren, P.C., Theron Warren, Regions Bank, and Michael Lewis in this case arising out of a commercial real estate transaction. Howard contends the trial court erred when it denied his claims against Warren and his law firm for breach of Warren's duties as a "settlement agent" and a "voluntary agent." He asserts the trial court also erred by denying his claim that Lewis conspired with a third party (Michael Gregorakos) to defraud him. For the reasons set forth below, we affirm.

> On appeal from the grant of summary judgment this [c]ourt conducts a de novo review of the evidence to determine whether there is a genuine issue of material fact and whether the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.

(Citation and punctuation omitted.) *Cox Enterprises v. Nix*, 274 Ga. 801, 804 (2) (560 SE2d 650) (2002). So viewed, the record shows that Howard entered into an agreement arranged by Gregorakos in which he would owner finance the sale of a 23.49 acre commercial real estate tract to an entity called Snellville Station Development. Gregorakos and Lamar Frady were the principals of Snellville Station. Howard testified that the agreement called for him to provide a first mortgage to Snellville Station in the amount of $1.7 million with a $250,000 "kicker" to be paid two years later. The agreement also provided that Howard would receive $460,874 at the time of closing.

The closing of the transaction took place in three stages. On Friday July 28, 2000, Gregorakos and Howard went to the law office of Pearce Hardwick where Gregorakos signed a promissory note in the principal amount of $1,715,944.50 in favor of Howard, as well as a deed to secure debt and security agreement. A rider attached to the security deed contained a cross-default provision stating that the property was "conveyed subject to that certain Deed to Secure Debt in favor of Regions Bank." Hardwick testified that he intentionally

held the security deed and recorded it on August 31, 2000, so that it would be subordinate to the Regions loan. Hardwick testified that the rider containing the cross-default provision was prepared on July 29, 2000, and denied that it was added later.

Hardwick testified that Gregorakos instructed him about the terms of the note and that it was always his understanding that the note was to be a second mortgage behind a first mortgage held by Regions Bank. It was his belief that Howard was aware that his loan would be subordinate to the Regions loan. Hardwick testified that no one told him before the closing that Howard was to receive a first mortgage. He acknowledged that he did not explain to Howard at the closing that he was receiving a second mortgage.

Hardwick mailed the security deed, as well as the rider, to Howard after it was recorded. Howard never contacted Hardwick after the closing to complain that he should have received a first mortgage. Howard testified that he did not review the rider when he received the deed from Hardwick.

The second phase of the transaction took place at the law offices of Theron Warren (Sellers & Warren, P.C.) on Monday July 31, 2000. It is undisputed that the following persons appeared at Warren's office for this phase of the closing: Theron Warren, Mike Lewis, a Regions Bank loan officer and division manager, Gregorakos, Frady, Howard, and his wife, Marie Howard. Warren prepared a settlement statement for this closing that included the following information: a $2.8 million first priority loan from Regions to Snellville Station Developers guaranteed by Frady and secured by the property; $100,000 earnest money paid to Howard before closing, a payment of $1,125,675.60 to Howard before closing, and $979,334.64 cash to Howard at closing.

Howard admitted that he signed a HUD-1 Certification that includes the following pre-typed statement:

> I have carefully reviewed the . . . Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a copy of the . . . Settlement Statement.

The bottom of the form contained the following statement: "WARNING: It is a crime to knowingly make false statements to the United States on this or any other similar form." The form was also signed by Gregorakos and Frady on behalf of Snellville Station Developers. Warren signed below the following statement on behalf of Sellers and Warren, P.C., which was listed as the settlement agent on the form: "To the best of my knowledge the . . . Settlement statement which I

have prepared is a true and accurate account of the funds which were received and have been or will be disbursed by the undersigned as part of the settlement of this transaction."

Howard also signed an "Acknowledgment and Receipt of Settlement Documents" that provided:

> The undersigned parties acknowledge that this transaction has been closed by the Closing Attorney and that the Closing Attorney was designated to close this transaction by and on behalf of the Lender. Closing Attorney accordingly represented the Lender in this transaction. Closing Attorney did not represent Purchaser/Borrower or any other party (other than Lender) in connection with this transaction. The undersigned finally acknowledge that they did not receive or rely upon any advice from Closing Attorney regarding this transaction.

According to Warren and Lewis, Warren explained each line of the completed HUD statement during the closing before Howard signed it. Gregorakos testified in his deposition that he did not have a clear memory of the closing, but believed that Warren went over every line in the completed HUD statement with Howard. Frady deposed that he could not recall whether Howard reviewed a completed settlement statement before signing it.

According to Howard, he left the closing early because he had a flight to catch for a vacation. At the time he had to leave, the settlement statement was not yet complete, and he decided to sign it in blank because Warren "told me that I would have to trust him, which I did, that he would fill these documents out after we left so they could go ahead and do the closing . . . and that's what I did. I read nothing. Didn't have an opportunity to read anything." Because Howard was due to receive a check for $460,874.25 after the third phase of the transaction to pay off another loan on the property, his wife gave a deposit slip to Gregorakos who offered to deposit this check on his behalf. It is undisputed that the check was deposited into Howard's account.

It is also undisputed that Warren gave a second check to Gregorakos after the third phase of the transaction that was payable to Howard in the amount of $518,460.39 The check for $518,460.39 and the check for $460,874.25 added together equal the $979,334.64 figure shown as paid to Howard on the settlement statement. According to Warren, Howard and Gregorakos conferred at the closing table and requested that the checks be issued in those amounts and given to Gregorakos.

In his deposition, Howard denied all knowledge of the

$518,460.39 check, and it is undisputed that this check was deposited into the bank account of Snellville Station Developers by Gregorakos. Gregorakos explained that the money was divided this way "for convenience" so that Howard would not have to write a check in this amount to Snellville Station Developers after the closing. According to Gregorakos, Howard would have been overpaid if he had received this amount at closing, and Howard understood that he would receive two checks at the closing, but only be able to keep one.

In the third phase of the closing that took place on August 1, 2000, Howard purchased a joint owner's interest in the property for approximately $460,000.

According to Howard, he first learned that he did not hold a first mortgage in August of 2003 when a Regions Bank representative called him and suggested that it was in his interest to make a past due interest payment on the Regions Bank loan as the holder of a second mortgage on the property. He subsequently filed suit against Sellers & Warren, P.C., Warren, Gregorakos, Lewis, Snellville Station Developers, and Regions Bank. He asserted claims for fraud, conspiracy to defraud, punitive damages, and attorney fees against all of the defendants. He asserted claims for legal malpractice against Warren; negligence against Warren, his law firm, and Regions Bank; a claim for conversion against Gregorakos, and a claim for negligent hiring and supervision against Regions Bank. In a detailed 18-page order, the trial court granted summary judgment to Warren, Sellers & Warren, P.C., Lewis, and Regions Bank and entered a final judgment in their favor. Howard's claims against Gregorakos and Snellville Station Developers remain pending below.

1. Howard contends the trial court erred because issues of fact exist with regard to Warren and his law firm's liability. A large portion of Howard's brief is devoted to establishing that Warren owed a duty to him despite the signed disclaimer of representation.[1] Howard's theory is that a duty that did not otherwise exist was created based upon his testimony about oral statements made by Warren during the closing about trusting Warren to complete the bank settlement statement.

> To prevail on a legal malpractice claim, a client must prove that (1) he employed the defendant attorney; (2) the attorney failed to exercise ordinary care, skill, and diligence; and (3) this failure was the proximate cause of damages to the

---

[1] To the extent Howard asserts that Warren owed him a legal duty as the settlement agent that was not disclaimed in the written acknowledgment signed by Howard, we reject it. See *Williams v. Fortson, Bentley & Griffin*, 212 Ga. App. 222, 223-224 (1) (b), (c) (441 SE2d 686) (1994).

client. To establish proximate cause, the client must show that but for the attorney's error, the outcome would have been different; any lesser requirement would invite speculation and conjecture. The defendant attorney is entitled to summary judgment if he shows that there is an absence of proof adduced by the client on the issue of proximate cause.

(Citation and punctuation omitted.) *Kramer v. Yokely*, 291 Ga. App. 375, 379-380 (2) (662 SE2d 208) (2008).

Howard asserts that Warren's failure to properly complete the settlement statement[2] was the proximate cause of his damages because "the transaction would not have otherwise closed and Howard would not have been deprived of his property."[3] The record, however, shows that Warren had no knowledge of any mortgage held by Howard and closed by another attorney (Hardwick); that Howard points to no evidence showing that he gave Warren instructions about the structure of the deal before departing for vacation; that Howard relied upon Hardwick to ensure that he obtained a first mortgage in the first phase of the transaction; that Howard received all of the money he expected to receive in the transaction; and that he would have been "more than satisfied" with the transaction if the deed provided to him by Hardwick had given him a first mortgage.

Based upon this undisputed evidence, the trial court did not err by granting summary judgment in favor of Warren and Sellers & Warren, P.C. See generally *Kitchen v. Hart*, 307 Ga. App. 145, 151 (1) (704 SE2d 452) (2010) (attorney in malpractice action entitled to summary judgment based upon lack of proximate cause).

2. Howard contends that the trial court erred by granting summary judgment in favor of Lewis (the loan officer) and Regions Bank on his claim that Lewis conspired with Gregorakos to defraud Howard. In order to prove conspiracy to commit fraud, a plaintiff must "show that two or more persons, acting in concert, engaged in conduct that constitutes a tort. Absent the underlying tort, there can be no liability for civil conspiracy." (Citations, punctuation and footnotes omitted.) *Argentum Intl. v. Woods*, 280 Ga. App. 440, 444 (2) (a) (634 SE2d 195) (2006).

Lewis testified that Gregorakos initially told him that the loan would be funded by Frady's sale of commercial property or a combination of such a sale and a cash infusion by Frady or Grego-

---

[2] In support of this argument, Howard points to inaccuracies in the settlement statement with regard to funds never received by him.

[3] Howard does not assert that he was damaged through increased income tax liability as a result of the settlement statement, and the record shows that he asserted his Fifth Amendment rights when questioned about any potential tax liability damages in his deposition.

rakos. Within a week of the closing date, Gregorakos told Lewis that "he had been talking to Mr. Howard about a deal for the equity" and that he would get Lewis "the specifics when it was finalized."

Three days before the closing, Lewis met with the regional loan committee to present the loan for approval. A memorandum submitted to the loan committee to obtain loan approval stated under a section titled "Sources of Equity: $920,000 will come from sale of one of Mr. Frady's commercial properties; $400,000 will come from Mr. Frady's personal assets; and $200,000 will come from developer who will not be party to the note." The loan committee approved the loan "[c]ontingent upon commercial property closing."

Frady testified that while he was aware that Snellville Station Developers was obtaining a loan from Regions, he never met with anyone at the bank about the loan, that he never gave the bank any financial information about the loan because Lewis already had it in connection with another loan, that he never agreed to sell his commercial property to fund the equity portion of the loan, and that he never planned to put $400,000 of his own money into the project.

Lewis testified that he was authorized to proceed with the loan even though the commercial property had not been sold "[i]f the borrower came to the table with the funds for the equity funds." He was not concerned that the commercial property had not yet closed at the time he obtained the loan approval because Gregorakos told him, three days before the closing, that he was working out a deal for the equity with Howard.

The record shows that Lewis and Gregorakos met privately with Warren before the closing. Warren testified that Lewis and Gregorakos instructed him to place the number $1,125,675.60 in lines 208 and 508 of the settlement statement. These lines describe this amount as "funds paid to seller prior to closing." Warren explained that he obtained the information on these lines of the HUD settlement statement "from the lender and from Michael Lewis and Michael Gregorakos."

Lewis initially testified in his deposition that he could not remember if Gregorakos told him that Howard was holding a second mortgage for the equity portion of the loan "at the closing or right after it." Shortly afterward, Lewis testified that he thought he learned it "right after the closing was completed" on the same day. Lewis acknowledged in his deposition that the HUD settlement statement did not reflect a second mortgage, but instead showed that the funds had been paid to Howard before the closing. Lewis admitted that he never investigated when the amount was paid to Howard or the source of the funds to pay Howard. He also testified that he was not concerned that the new equity source was different than what had been approved by the loan committee and also

approximately $400,000 less than the amount submitted to the loan committee because there was a $5 million appraisal for the property. Lewis explained that any discrepancies in the closing statement did not concern him because it was "accepted" by Howard, as well as Gregorakos and Frady on behalf of Snellville Station Developers. Additionally, he viewed a second mortgage "almost like a guaranty" because the second mortgage holder would have an incentive to pay off any default on the first mortgage.

The last item of evidence relevant to this issue is a copy of a check written by Gregorakos on a Regions Bank account in the name of Michael Gregorakos, Inc. to Randy Howard in the amount of $1,125,675. Gregorakos testified that he believed he gave this check to Howard at the closing at Warren's request, that he believed the law firm made a copy of the original check, that Howard later gave the original back to him in exchange for the second mortgage, that Howard understood the account had insufficient funds to cash the check, and that the original check was never cashed because Gregorakos destroyed it.

Howard testified that he never saw this check before his deposition. Lewis testified that he never saw a copy of this check until Howard's deposition, that he did not see Gregorakos give this check to Howard in the closing, that he knew Gregorakos did not have the funds to cover a check of that size, and that if he had known about the check it would have caused him concern. Warren testified that this check was not a part of his closing file and that he did not recall asking Gregorakos for this check at the closing.

Viewed in the light most favorable to Howard (the nonmovant), the record shows that Lewis learned at the closing that Howard was providing a second mortgage for the equity portion of the Regions Bank loan that was not reflected in the settlement agreement and had not been approved by Regions Bank's loan committee. By his own admission, Lewis was unconcerned about this discrepancy because Howard would then act "almost as a guaranty" for the Regions Bank loan. A copy of the front side of the $1.125 million check from Gregorakos to Howard was apparently obtained from Regions Bank by Howard's counsel, raising an inference that Lewis may or should have been aware of it, even though he claimed that he had never seen it and would have been very concerned had he seen it because he knew Gregorakos did not have funds sufficient to cover a check of that size.

While this evidence may show that Lewis was not a very thorough loan officer and that he may have helped Gregorakos obtain the Regions Bank loan without proper documentation, it does not raise any inference that Lewis knew that Howard believed he held a first mortgage or that Lewis conspired with Gregorakos to

deceive Howard into taking a second mortgage. See *Summit Automotive Group v. Clark*, 298 Ga. App. 875, 879 (2) (681 SE2d 681) (2009) (granting summary judgment because plaintiffs failed to present any evidence that a conspiracy to defraud them existed or could be inferred). "The law does not authorize a finding that conspiracy exists merely because of some speculative suspicion, and the mere fact that conspiracy has been alleged does not require submission of the question to a jury where there is no evidence of record to support the claim." (Citation and punctuation omitted.) Id. at 880 (2). Because Howard cannot establish that Lewis conspired with Gregorakos to commit fraud *against Howard*, the trial court properly granted summary judgment in favor of Lewis and Regions Bank on Howard's conspiracy claim.

*Judgment affirmed. Mikell, J., concurs. Adams, J., concurs in the judgment only.*

DECIDED MARCH 29, 2011 —
RECONSIDERATION DENIED APRIL 14, 2011 — ■■■■■■■■■

*DuBose, Massey, Blair & Evans, C. Wilson DuBose, James L. Ford, Sr., Jonathan A. Parrish*, for appellant.

*Stewart, Melvin & Frost, J. Douglas Stewart, Carr & Palmer, W. Pitts Carr, Emory L. Palmer, James R. Reed*, for appellee.