A11A0957. McKEE FOODS CORPORATION v. LAWRENCE et al.
(712 SE2d 79)

McFADDEN, Judge.

Jerry Lawrence and his wife sued Terry Lee Carswell, Carswell's snack distribution company, and McKee Foods Corporation for damages sustained when Carswell's delivery truck collided with a vehicle driven by Lawrence. With respect to McKee, the Lawrences alleged vicarious liability for Carswell's negligence. McKee moved for summary judgment, arguing that neither Carswell nor his company was a McKee agent or employee, undermining the vicarious liability claim. The trial court denied the motion, and we granted McKee's application for interlocutory appeal. Because the evidence shows

---

that McKee did not control the time, manner, and method of the work performed by Carswell and his company, we reverse.

Summary judgment is appropriate when no genuine issues of material fact remain and the moving party is entitled to judgment as a matter of law. See *Schlotzsky's, Inc. v. Hyde*, 245 Ga. App. 888 (538 SE2d 561) (2000). We review a trial court's summary judgment ruling de novo, construing the evidence and all reasonable inferences in favor of the nonmoving party. Id.

So viewed, the record shows that McKee produces Little Debbie and Sunbelt snack items that it sells to distributors, who then sell the products to retail outlets. In April 2001, McKee entered into a distributorship agreement with Carswell's company, Terry's Distributor Snacks, Inc. ("TDS"). Among other things, the agreement defined the products that TDS could distribute, set forth payment procedures, and established the distribution territory. It also required TDS to provide facilities for the distribution business, comply with sanitation guidelines for handling and storing the products, obtain insurance, and maintain a certain corporate structure. Finally, the agreement addressed the parties' relationship, stating:

> The parties intend to create an independent contractor relationship between them and agree that Distributor shall be an independent contractor for all purposes. Nothing herein shall be construed: (i) to be inconsistent with that relationship (ii) as constituting Distributor as the partner, agent, or employee of McKee or (iii) as authorizing Distributor, or any agent or employee of Distributor, to create or assume any obligation or liability in the name of McKee. McKee is interested only in the results obtained under this Agreement and hereby specifically relinquishes any right to control the manner and means by which Distributor achieves those results. Distributor shall exercise its independent business discretion in determining the manner and means of achieving those results and in directing the activities of any agents or employees of Distributor. Distributor shall hold itself out as an independent contractor and shall not be treated as an agent or employee of McKee for federal tax purposes or for any other purpose. Distributor shall comply with all laws applicable to Distributor's business, shall obtain all appropriate licenses for that business, and shall pay all business or self-employment taxes applicable to Distributor and that business.

TDS began operating under the agreement, and in August 2007, a delivery truck driven by Carswell struck Jerry Lawrence's vehicle.

The Lawrences sued Carswell, TDS, and McKee, alleging that Carswell was negligent, that he was engaged in selling McKee products at the time of the collision, and that McKee was vicariously liable for all damages caused by Carswell's negligence. McKee moved for summary judgment on the vicarious liability claim. Finding that questions of fact remain as to whether the distributorship agreement created an employer-employee relationship, the trial court denied the motion. This appeal followed.

Although an employer may be held vicariously liable for the torts of an employee, such liability does not extend to torts committed by an independent contractor. See OCGA §§ 51-2-2, 51-2-4, 51-2-5 (4). Control is the key question in determining the type of employment relationship created by a contract for services. An employer-employee relationship arises when "the contract gives, or the employer assumes, the right to control the time, manner, and method of executing the work." (Punctuation omitted.) *McLaine v. McLeod*, 291 Ga. App. 335, 339 (1) (661 SE2d 695) (2008). If, however, such control is lacking and a contract merely gives the employer the right "to require certain definite results in conformity to the contract," an independent contractor relationship exists. Id. An agreement that clearly designates a party as an independent contractor presumably creates such a relationship unless the evidence shows otherwise. See id.

The agreement in this case designates TDS as an independent contractor. The Lawrences argue, however, that other parts of the contract demonstrate McKee's control over the distribution operations. In support, they cite numerous provisions, such as those defining how the products should be stored prior to sale, insurance requirements, the scope of the distributor's territory, the distributor's use of trademarks, and McKee's right to determine whether the distributor is maintaining satisfactory sales.

As detailed below, these provisions establish broad guidelines for a McKee distributorship. They do not constitute exercise of control over TDS's day-to-day distribution and delivery operations. Instead, the record shows that Carswell and TDS had complete control over the time, manner, and method of executing the work. Pursuant to the distribution agreement, TDS purchased products from McKee, then resold and distributed the merchandise to retailers. Once TDS received inventory from McKee, it belonged to TDS and could not be returned, even if TDS failed to sell the products. Carswell testified that because TDS had to absorb any losses resulting from unsold or expired products, it ordered carefully from McKee, making its own decisions as to the amount and type of products needed by its customers. TDS's income was based on the difference between the price it paid for the products and the amount at which it sold those

products to retailers. McKee made suggestions regarding the amount distributors should charge retailers for products, but TDS was not required to follow those suggestions and often chose not to follow them.

Carswell further testified that TDS did not receive any benefits, commissions, or compensation from McKee, and he made all business decisions regarding his company. He set TDS's schedule, deciding which customers TDS would call on and how often they should be visited. TDS engaged in its own customer relations, selecting its customers, choosing how to promote and display products, and developing new business. TDS was free to hire its own employees, and Carswell directed and controlled those employees without any input or involvement from McKee. McKee also did not require TDS to use any particular delivery vehicles. TDS chose its vehicles based on its needs, and none displayed a McKee logo. Finally, TDS was not prohibited by the distributorship agreement from selling items produced by other manufacturers.

As we have noted in the franchise context,

> a franchisor is faced with the problem of exercising sufficient control over a franchisee to protect the franchisor's national identity and professional reputation, while at the same time foregoing such a degree of control that would make it vicariously liable for the acts of the franchisee and its employees.

*Pizza K, Inc. v. Santagata*, 249 Ga. App. 36, 37 (547 SE2d 405) (2001). To this end, a franchisor may set detailed and specific standards regarding how a franchisee manufactures, packages, prepares, or serves the franchisor's product. *Schlotzsky's*, supra at 890. The decision to implement such standards, monitor compliance, or terminate a franchisee for noncompliance "is not the equivalent of retaining day-to-day supervisory control of the franchisee's business operations." *Pizza K*, supra at 39.

These same principles apply here. McKee had an interest in protecting the reputation and viability of its products and sales network. It addressed this interest by, among other things, regulating distributors' storage facilities and sanitation efforts, establishing requirements for product freshness and trademark usage, and limiting the types of entities it wanted in its distribution chain. None of these requirements, however, dealt with a distributor's day-to-day operations.

Carswell and TDS were free to make business decisions regarding sales efforts and growth, customer calls, delivery times and routes, delivery methods, pricing, product placement, and other

day-to-day matters. Although McKee imposed certain overarching guidelines and regulations on TDS via the distributorship agreement, those provisions "simply served as a means of ensuring conformance with a certain level of quality and protecting [McKee's] professional reputation." *Pizza K*, supra at 39. Simply put, McKee did not have the right to control the time, manner, and method of TDS's daily activities. Accordingly, the trial court erred in denying McKee's motion for summary judgment. See id.; *Schlotzsky's*, supra at 889-890; *Frey v. Pepsico*, 191 Ga. App. 585, 586 (1) (382 SE2d 648) (1989); *Tanner v. USA Today*, 179 Ga. App. 722, 723 (2) (347 SE2d 690) (1986).

*Judgment reversed. Phipps, P. J., and Andrews, J., concur.*

DECIDED JUNE 3, 2011 —
RECONSIDERATION DENIED JUNE 17, 2011 — 

*James, Bates, Pope & Spivey, John F. Kennedy, Chambliss, Bahner & Stophel, William H. Pickering*, for appellant.

*Spivey, Carlton & Edenfield, J. Franklin Edenfield, Glen A. Cheney, Charles C. Mayers*, for appellees.