Elizabeth MWANGI, Plaintiff,

v.

**FEDERAL NATIONAL MORTGAGE ASSOCIATION, Whitman Associates, Inc., d/b/a A Plus Realty Georgia, and Asset Management Specialists, LLC, Defendants.**

**CIVIL ACTION FILE NO.: 4:14–CV–0079–HLM**

United States District Court, N.D. Georgia, Rome Division.

Signed February 16, 2016

Alyson A. Straight, Andrew C. Evans, Evans Law, LLC, Atlanta, GA, for Plaintiff.

Frank Reid Olson, John Dale Andrle, Cobb, Olson & Andrle, LLC, David S. Klein, Ned Blumenthal, Weissman Nowack Curry & Wilco, P.C., Atlanta, GA, Burke Blackwell Johnson, Morris Schneider Wittstadt, LLC, Loganville, GA, for Defendants.

## ORDER

Harold Lloyd Murphy, UNITED STATES DISTRICT JUDGE

This case is before the Court on the Motion for Summary Judgment filed by Defendant Asset Management Specialists, LLC ('Defendant AMS') [109].

## I. Background

### A. Factual Background

Keeping in mind that, when deciding a motion for summary judgment, the Court must view the evidence and all factual inferences in the light most favorable to the party opposing the motion, the Court provides the following statement of facts. *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir.2012). This statement does not represent actual findings of fact. *Rich v. Sec'y. Fla. Dep't of Corr.*, 716 F.3d 525, 530 (11th Cir.2013). Instead, the Court has provided the statement simply to place the Court's legal analysis in the context of this particular case or controversy.

As required by the Local Rules, Defendant AMS filed a Statement of Material Facts as to Which There Is No Genuine Issue to Be Tried ('DSMF'). (Docket Entry No. 109–1.) As also required by the Local Rules, Plaintiff filed a response to DSMF ('PRDSMF'). (Docket Entry No. 121–1.) As permitted by the Local Rules,

Plaintiff filed her own Statement of Additional Material Facts ('PSMF'). (Docket Entry No. 121–14.) Defendant AMS did not file a response to PSMF, and it has admitted the statements contained in PSMF that are supported by the record. The Court evaluates DSMF, PRDSMF, and PSMF below.

In 2006, Plaintiff purchased property located at 101 Natalie Court, Dallas, Georgia 30157 (the 'Property') with a loan (the 'Loan'). (PSMF ¶ 1.) The Loan was secured by a deed to secure debt (the 'Security Deed'), which named Mortgage Electronic Registration Systems ('MERS') as the nominee. (Id. ¶ 2.) In 2012, MERS assigned the Loan to JPMorgan Chase Bank, National Association ('Chase'), (Id. ¶ 3.) On February 5, 2013, Chase foreclosed on the Property. (Id. ¶ 4.)

After the foreclosure, Defendant Federal National Mortgage Association ('Defendant Fannie Mae') obtained the Property via a Special Warranty Deed from Chase. (PSMF ¶ 5.) After the foreclosure, Defendant Fannie Mae assigned a local real estate broker, Defendant Whitman Associates, Inc., d/b/a A Plus Realty Georgia ('Defendant Whitman') to manage the Property. (DSMF ¶ 1; PRDSMF ¶ 1; PSMF ¶ 6.) Christopher Singleton ('Mr. Singleton') is a Realtor who handles properties on behalf of Defendant Whitman. (DSMF ¶ 2; PRDSMF ¶ 2; PSMF ¶ 7.) Mr. Singleton recalls that he received the assignment for the Property on or about February 8, 2013, the Friday immediately following the Tuesday foreclosure sale. (DSMF ¶ 3; PRDSMF ¶ 3.)

According to Mr. Singleton, he searched the tax records for the Property and reviewed the multiple listing services. (DSMF ¶ 4; PRDSMF ¶ 4.) The listing services stated that the Property was 'vacant,' and pictures posted showed no furniture in the house. (DSMF ¶ 5, as modified per PRDSMF ¶ 5.) Mr. Singleton also visited the Property on February 8. (DSMF ¶ 6; PRDSMF ¶ 6.) Mr. Singleton posted a 'Knowing Your Options' flyer on the door ('KYO flyer'), stating that Plaintiff had ten days to call Defendant Fannie Mae. (PSMF ¶¶ 8.)

Mr. Singleton returned to the Property with Clint Aiola a few days later. (DSMF ¶ 7; PRDSMF ¶ 7; PSMF ¶ 9.) According to Mr. Singleton, he and Mr. Aiola went into the house, and Mr. Singleton looked through the entire house. (DSMF ¶ 8; PRDSMF ¶ 8 (admitting Mr. Singleton gave this testimony).) Mr. Singleton testified that he determined that there was 'nothing of value' in the house, and that he believed the house was vacant. (DSMF ¶ 8; PRDSMF ¶ 8 (admitting Mr. Singleton gave this testimony).) Mr. Singleton had Mr. Aiola re-key the Property. (DSMF ¶ 9; PRDSMF ¶ 9; PSMF ¶ 9.) Defendant Fannie Mae did not obtain a Writ of Possession before Mr. Aiola changed the locks. (PSMF ¶ 10.)

On February 9, 2013, after Mr. Aiola re-keyed the Property, Mr. Singleton updated Defendant Fannie Mae's electronic database system to reflect that the Property was vacant and had been re-keyed. (DSMF ¶¶ 10–11; PRDSMF ¶¶ 10–11; PSMF ¶ 11.) The entry of this information into the system automatically triggered an assignment to Defendant AMS to perform the trash removal, or to conduct a 'trash out.' (DSMF ¶ 12; PRDSMF ¶ 12; PSMF ¶ 11.) The automatic assignment through the electronic database system is nearly simultaneous with the entry of the 'rekey' information into the system by the broker. (DSMF ¶ 13; PRDSMF ¶ 13.)

After receiving the trashout assignment, Defendant AMS transmitted a work order to its local subcontractor, Mr. Aiola, to have Mr. Aiola perform the trash-out. (DSMF ¶ 14; PRDSMF ¶ 14.) Mr. Aiola returned a completed work order to De-

fendant AMS indicating that he completed the trashout on February 13, 2013. (DSMF ¶ 15; PRDSMF ¶ 15.)

On February 13, 2013, the date of the trash-out, all personal items inside the Property were removed. (PSMF ¶ 12.) Defendant Fannie Mae did not obtain a writ of possession before the trash-out at the Property. (*Id.* ¶ 13.) Defendant Fannie Mae never filed an eviction proceeding against Plaintiff in any Paulding County, Georgia, court with respect to the Property, (*Id.* ¶ 14.) Defendant Fannie Mae also never filed a dispossessory action against Plaintiff in any Paulding County court with respect to the Property. (*Id.* ¶ 15.) Defendant Fannie Mae never obtained a writ of possession from any court in Paulding County with respect to the Property. (*Id.* ¶ 16.) Defendant Fannie Mae never assigned Defendant AMS the task of initiating an eviction or dispossessory proceeding, and Defendant AMS never undertook any action with respect to evicting Plaintiff. (DSMF ¶ 23; PRDSMF ¶ 23.)

Plaintiff contends that she never consented to Defendants changing her locks or removing her personal items. (PSMF ¶ 17.) According to Plaintiff, she intended to return to the Property and retrieve her personal items. (*Id.* ¶ 18.)

Defendant AMS contends that: (1) Mr. Aiola is an independent contractor and Defendant AMS has no control over his work (Aff. of Robert Hicks (Docket Entry No. 109–3) ¶¶ 8 –13)[1]; (2) Mr. Aiola exercises an independent business, and he is not subject to the immediate direction and control of Defendant AMS (*id.* ¶¶ 8–13); (3) Defendant AMS does not have the right to direct the time, manner, methods, or means of the execution of the work that Mr. Aiola performs (*id.* ¶ 9); (4) Defendant AMS does not have the right to direct

the time, manner, methods, or means of execution of the work performed by Mr. Aiola's employees (*id.* ¶ 10); (5) no person over whom Defendant AMS had the right to direct the time, manner, methods, or means of execution of work was ever on the Property (*id.* ¶ 11); (6) no person over whom Defendant AMS had the right to direct the time, manner, methods, or means of execution of work changed the locks or re-keyed the Property (*id.* ¶ 12); and (7) no person over whom Defendant AMS had the right to direct the time, manner, methods, or means of execution of work ever had possession of any of Plaintiffs personal items (*id.* ¶ 13.)

Plaintiff, on the other hand, points out that Defendant Fannie Mae assigns 'Field Services' vendors in every state and territory except Guam. (PSMF ¶ 19.) Defendant AMS is Defendant Fannie Mae's exclusive Field Services Vendor in Georgia, (*id.* ¶ 20.) Defendant Fannie Mae provides 'Field Services Checklists' to Field Services Vendors, including Defendant AMS. (*id.* ¶ 21.) Defendant Fannie Mae created a document, 'Field Services Company Responsibilities,' which outlines the 'Initial Services' that Field Services Vendors are to perform, including: (1) removing all trash and debris; (2) winterization, in season and where geographically required; (3) exterior maintenance or snow removal services; (4) boarding of property, as appropriate; (5) interior cleaning; and (6) removal of vehicles. (*Id.* ¶ 22.) 'That document also includes an Initial Services and Monthly Maid Services Checklist, which lists forty-five bulleted items that gare required and part of the services [Defendant] Fannie Mae expects to be performed and maintained by the Field Service Company at each property.' (*Id.* ¶ 23.)

---

**1.** The Supplemental Affidavit of Robert Hicks provides a foundation to show that Mr. Hicks had personal knowledge of the facts set forth in his first Affidavit. (*See generally* Supp. Aff. of Robert Hicks (Docket Entry No. 129) at 13–15.)

Defendant Fannie Mae's Safety Hazard Checklist and Exterior Services Checklist include forty-four additional · items that Field Services Companies are required to perform if applicable to the property. (*Id.* ¶ 24.)

On September 8, 2011, Defendant AMS and Mr. Aiola, doing business as West Georgia Property Management, executed a Subcontractor Agreement (the 'Subcontractor Agreement'). (PSMF ¶ 25.) The Subcontractor Agreement automatically renews each month. (*Id.* ¶ 26.) Defendant AMS reserves the right to terminate the Subcontractor Agreement at any date, with no further compensation, if it determines that Mr. Aiola is not performing his obligations. (*Id.* ¶ 127.) The Subcontractor Agreement specifically states:

10. RELATIONSHIP OF PARTIES. It is understood by the parties that CONTRACTOR is an independent contractor with respect to [Defendant] AMS, and not an employee of [Defendant] AMS. [Defendant] AMS will not provide fringe benefits, including liability, workman's compensation, health insurance benefits, paid vacation, or any other employee benefit, for the benefit of CONTRACTOR.

(Subcontractor Agreement (Docket Entry No. 121–4) ¶ 10 (capitalization in original).)

Under the Subcontractor Agreement, Defendant AMS requires Mr. Aiola to 'participate in a minimum of one field training meeting with [Defendant] AMS,' and provides that Mr. Aiola 'will also attend scheduled meetings with a notice of no less than 48 hours.' (PSMF ¶ 28.) The Subcontractor Agreement requires Mr. Aiola to 'clean all of his materials and remove from the site all dirt, debris, and rubbish caused by [Mr. Aiola] in the execution of his work.' (*Id.* ¶ 29.) The Subcontractor Agreement requires Mr. Aiola to 'rigidly adhere to starting and quitting times as established

by' Defendant AMS. (*Id.* ¶ 30.) The Subcontractor Agreement also requires Mr. Aiola and his employees to 'conduct themselves in a professional manner at all times while representing [Defendant] AMS and [Defendant] AMS Clients,' and requires that their attire comply with 'the guidelines set forth by [Defendant] AMS (i.e., no worn attire with offensive language or symbols.)' (*Id.* ¶ 31.)

The Subcontractor Agreement provides that Mr. Aiola must protect 'installed items by covering items immediately after installation,' and must 'supply all material to cover items.' (PSMF ¶ 32.) The Subcontractor Agreement requires that all work be 'completed and documented' within forty-eight hours of the assigned completion date. (*Id.* ¶ 33.) The Subcontractor Agreement provides that Defendant AMS will rate Mr. Aiola's performance based on the 'quality of services completed and timely reporting as laid out by [Defendant] AMS policy and procedure.' (*Id.* ¶ 34.) The Subcontractor Agreement requires that Mr. Aiola 'cooperate to the fullest extent with [Defendant AMS] in supplying workmen who can and will work in harmony with other trades.' (*Id.* ¶ 35.) The Subcontractor Agreement provides that Defendant AMS must approve all 'work order additions and omissions.' (14 11 36.) The Subcontractor Agreement states that Defendant AMS will issue payment only upon the 'completion of assigned work and services which have been deemed acceptable by [Defendant] AMS.' (*Id.* ¶ 37.)

Defendant AMS's Work Order to Mr. Aiola in this case is dated February 10, 2013 (the 'Work Order'), and directs Mr. Aiola to perform Initial Services. (PSMF ¶ 38.) The Work Order required Mr. Aiola to contact a representative of Defendant AMS if he saw 'personal property over $500.' (*Id.* ¶ 39.) Mr. Aiola gave an affidavit stating that he removed 'less than five

cubic yards.' (*Id.* ¶ 40.) The work order contained the phone numbers for the Realtor, Mr. Singleton, and Defendant AMS's manager. (*Id.* ¶ 41.) Plaintiff presented evidence indicating that Mr. Aiola had unilateral authority to stop the trash-out. (*Id.* ¶ 42.)

Plaintiff's Realtor, Kimani Karangu, came to the Property on February 13, 2015, while Mr. Aiola or his crew were at the Property executing the work order. (PSMF 43.) Mr. Karangu testified that he told the crew that they were not supposed to be removing stuff because the Property had just been foreclosed. (*Id.* ¶ 44.) According to Defendant Fannie Mae's representative, Mr. Aiola or his crew should have stopped the trash-out if they were approached and were notified that the items at the Property were not abandoned. (*Id.* ¶ 45.) Defendant Fannie Mae's representative also noted that Mr. Aiola or his crew could have contacted Mr. Singleton if someone instructed them to leave the items at the Property during the trash-out. (*Id.* ¶ 46.)

Mr. Kimani testified that, when he arrived at the Property on the day of the trash-out, he observed a number of personal items at the Property, including a couch, bedding, clothes, jewelry, a television, a china cabinet, and many boxes. (PSMF ¶ 47.) Mr. Kimani took photographs of the Property's garage and the dumpster on the day of the trash-out. (*Id.* ¶ 48.)

On February 13, 2013, the day of the trash-out, Defendant AMS, via Mr. Aiola, deposited the personal items left on the Property into a dumpster. (PSMF ¶ 49.) Defendant AMS, via Mr. Aiola, then removed the dumpster from the Property. (*Id.*)

## B. Procedural Background

The Court incorporates the procedural background portions of its earlier Orders into this Order as if set forth fully herein, and adds only those procedural background facts that are relevant to the instant Order. (Orders of Mar. 9, 2015 (Docket Entry Nos. 68–69).) On December 7, 2015, Defendant AMS filed its Motion for Summary Judgment. (Docket Entry No. 109.) The briefing process for that Motion is complete, and the Court finds that the matter is ripe for resolution.

## II. Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) allows a court to grant summary judgment when 'there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law.' Fed. R.Civ.P. 56(a). The party seeking summary judgment bears the initial burden of showing the Court that summary judgment is appropriate and may satisfy this burden by pointing to materials in the record. *Jones v. UPS Ground Freight,* 683 F.3d 1283, 1292 (11th Cir.2012). Once the moving party has supported its motion adequately, the burden shifts to the non-movant to rebut that showing by coming forward with specific evidence that demonstrates the existence of a genuine issue for trial. *Id.*

When evaluating a motion for summary judgment, the Court must view the evidence and draw all reasonable factual inferences in the light most favorable to the party opposing the motion. *Morton v. Kirkwood,* 707 F.3d 1276, 1280 (11th Cir. 2013); *Strickland,* 692 F.3d at 1154. The Court also must 'resolve all reasonable doubts about the facts in favor of the non-movant.' *Morton,* 707 F.3d at 1280 (internal quotation marks and citations omitted). Further, the Court may not make credibility determinations, weigh conflicting evidence to resolve disputed factual issues, or assess the quality of the evidence presented. *Strickland,* 692 F.3d at 1154. Finally,

the Court does not make factual determinations. *Rich,* 716 F.3d at 530.

## III. Discussion

### A. Independent Contractor

■ Defendant AMS correctly points out that neither it nor any of its direct employees or agents were present at the Property or took part in the trash-out. Although Defendant AMS contracted with Mr. Aiola to perform the trash-out at the Property, Defendant AMS argues that it is not responsible for any allegedly wrongful conduct on the part of Mr. Aiola or his crew because Mr. Aiola was an independent contractor. (Def. AMS's Br. Supp. Mot. Summ. J. (Docket Entry No. 109–2) at 8–14.)

O.C.G.A. § 51–2–4 provides: 'An employer generally is not responsible for torts committed by his employee when the employee exercises an independent business and in it is not subject to the immediate direction and control of the employer.' O.C.G.A. § 51–2–4. O.C.G.A. § 51–2–5, however, sets forth exceptions to the general rule, and states:

An employer is liable for the negligence of a contractor:

(1) When the work is wrongful in itself or, if done in the ordinary manner, would result in a nuisance;

(2) If, according to the employer's previous knowledge and experience,. the work to be done is in its nature dangerous to others however carefully performed;

(3) If the wrongful act is a violation of a duty imposed by express contract upon the employer;

(4) If the wrongful act is the violation of a duty imposed by statute;

(5) If the employer retains the right to direct or control the time and manner of executing the work or interferes and assumes control so as to create the relation of master and servant or so that an injury results which is traceable to his interference; or

(6) If the employer ratifies the unauthorized wrong of the independent contractor.

■ O.C.G.A. § 51–2–5. 'The issue in determining whether one was an employee or an independent contractor is whether the employer retained the right to exercise control over the time, place or manner of the work performed.' *BellSouth Telecomms., Inc. v. Helton,* 215 Ga.App. 435, 435, 451 S.E.2d 76, 78 (1994) (internal quotation marks and citation omitted). 'Where the contract of employment clearly denominates the other party as an independent contractor, that relationship is presumed to be true unless the evidence shows that the employer assumed such control.' *Id.* at 435, 451 S.E.2d at 78 (internal quotation marks and citation omitted). Whether an individual or company is an independent contractor generally is a question of fact. *Slater v. Canal Wood Corp. of Augusta,* 178 Ga.App. 877, 878, 345 S.E.2d 71, 72 (1986).

■ The Georgia courts have recognized that an employer-employee relationship will not arise simply because the employer 'has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations.' *Slater,* 178 Ga.App. at 880, 345 S.E.2d at 74. Instead, for an employer-employee relationship to arise, '[t]here must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.' *Id.* at 880, 345 S.E.2d at 74; *see also Ga. Messenger Serv., Inc. v. Bradley,* 311 Ga.App. 148, 149, 715 S.E.2d 699, 702 (2011) ('The test

for determining whether an employer is exercising a degree of control over an independent contractor's work such that the law will deem the independent contractor to be a servant of that employer-thus making the employer vicariously liable for any wrongful acts committed by the contractor-is whether the contract gives, or the employer assumes, the right to control the time, manner, and method of the performance of the work, as distinguished from the right to merely require certain definite results in conformity with the contract.' (internal quotation marks, citation, and footnote omitted)).

Here, the Subcontractor Agreement specifically denominated Mr. Aiola as an independent contractor. (Subcontractor Agreement § 10.) The Subcontractor Agreement, however, allowed Defendant AMS a significant amount of control over the time, manner, and method in which Mr. Aiola executed the work, and, via Defendant Fannie Mae's procedures, imposed numerous requirements on Mr. Aiola. Under those circumstances, the evidence, viewed in the light most favorable to Plaintiff as the nonmovant, creates a genuine dispute as to whether Mr. Aiola was an independent contractor of Defendant AMS. *See Helton*, 215 Ga.App. at 435–36, 451 S.E.2d at 78 (finding that sufficient evidence supported the trial court's finding that an individual was not an independent contractor, notwithstanding the contract's statement that the individual was an inde-

pendent contractor).[2] The Court therefore denies this portion of Defendant AMS's Motion for Summary Judgment.

## B. Attorney's Fees

 Next, Defendant AMS argues that it cannot be liable for attorney's fees under O.C.G.A. § 13–6–11 because it did not act in bad faith and was not stubbornly litigious. (Def. AMS's Br. Supp. Mot. Summ. J. at 14–16.) O.C.G.A. § 13–6–11 provides: 'The expenses of litigation generally shall not be allowed as a part of the damages; but where the plaintiff has specially pleaded and has made prayer therefor and where the defendant has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessarily trouble and expense, the jury may allow them.' O.C.G.A. § 13–6–11. Plaintiff focuses on the 'bad faith' portion of O.C.G.A. § 13–6–11 in her response brief, and the Court therefore does not address the 'stubbornly litigious' or 'unnecessary trouble and expense' portions of the statute. (Pl.'s Resp. Def. AMS's Mot. Summ. J. (Docket Entry No. 121) at 17–18.) 'Bad faith is bad faith connected with the transaction and dealings out of which the cause of action arose, rather than bad faith in defending or resisting the claim after the cause of action has already arisen.' *Lewis v. D. Hays Trucking, Inc.*, 701 F.Supp.2d 1300, 1313 (N.D.Ga.2010) (internal quotation marks and citation omitted). 'Bad faith requires more than bad judgment or negligence,

---

**2.** In its reply, Defendant AMS relies on *Pizza K. Inc. v. Santagata*, 249 Ga.App. 36, 547 S.E.2d 405 (2001), as well as *McKee Foods Corp. v. Lawrence*, 310 Ga.App. 122, 712 S.E.2d 79 (2011), in support of its contention that it did not retain sufficient control over Mr. Aiola for Mr. Aiola to be considered as anything other than an independent contractor. (Def. AMS's Reply Supp. Mot. Summ. J (Docket Entry No. 129) at 2–8.) *Pizza K*, however, addressed the question whether a franchisor should have liability for the acts of a franchisee. *Pizza K. Inc.*, 249 Ga.App. at

37, 547 S.E.2d at 706. The Georgia Court of Appeals expressly recognized that a franchise agreement created a 'special relationship' and gave rise to unique concerns. *Id.* at 37, 547 S.E.2d at 406. Likewise, *McKee Foods* relied on principles from the franchise context to determine that a distributor for a manufacturer was an independent contractor. 310 Ga. App. at 124–26, 712 S.E.2d at 81–82. Defendant AMS does not argue that it and Mr. Aiola were engaged in a franchisor/franchisee relationship, and *Pizza K* and *McKee Foods* thus do not warrant a different result.

rather the statute imports a dishonest purpose or some moral obliquity and implies conscious doing of wrong and a breach of known duty through some motive of interest of ill will.' *Id.* (internal quotation marks and citation omitted). The Georgia Supreme Court has noted that '[e]very intentional tort invokes a species of bad faith that entitles a person wronged to recover the expenses of litigation including attorney fees.' *Tyler v. Lincoln,* 272 Ga. 118,- 121, 527 S.E.2d 180, 183 (2000) (alteration in original) (internal quotation marks and citation omitted). 'The question of whether attorney fees are warranted, that is, whether one of the three statutory grounds have been established, is ordinarily for the jury to decide.' *Jeff Goolsby Homes Corp. v. Smith,* 168 Ga.App. 218, 221, 308 S.E.2d 564, 567 (1983); *see also Tyler,* 272 Ga. at 121, 527 S.E.2d at 183 ('[G]enerally the question of bad faith is for the jury, to be determined from its consideration of the facts and circumstances in the case.').

Here, Plaintiff has asserted claims for intentional torts, including conversion and trespass, and those claims survive summary judgment as to Defendant AMS. As such, a genuine dispute remains as to Plaintiff's bad faith claim for attorney's fees under O.C.G.A. § 13–6–11. *See Tyler,* 272 Ga. at 121, 527 S.E.2d at 184 ('Inasmuch as the Court of Appeals determined that the question of the developers' commission of an intentional tort remained for the jury to consider, the claim for attorney fees rooted in bad faith concerning those actions should have also been left for the jury.' (internal quotation marks and citation omitted)). Moreover, Plaintiff presented evidence from which a reasonable jury could find that Plaintiff's Realtor informed Mr. Aiola that the Property was not abandoned and that the trash-out was improper because the foreclosure had only recently occurred. Viewing that evidence in the light most favorable to Plaintiff, a genuine dispute remains as to whether an award of attorney's fees based on bad faith is appropriate. The Court therefore denies this portion of Defendant AMS's Motion for Summary Judgment.

## C. Punitive Damages

 Finally, Defendant AMS argues that no evidence supports Plaintiff's punitive damages claim. (Def. AMS's Br. Supp. Mot. Summ. J. at 16–18.) O.C.G.A. § 51–12–5.1(b) provides: 'Punitive damages may be awarded only in such tort actions in which it is proven by clear and convincing evidence that the defendant's actions showed willful misconduct, malice, fraud, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.' O.C.G.A. § 51–12–5.1(b). The Georgia Supreme Court observed that, with respect to a previous punitive damages statute: 'Punitive damages cannot be imposed without a finding of some culpable conduct. Negligence, even gross negligence, is inadequate to support a punitive damage award.' *Colonial Pipeline Co. v. Brown,* 258 Ga. 115, 118, 365 S.E.2d 827, 830 (1988). 'A conscious indifference to consequences relates to an intentional disregard of the rights of another.' *Tyler,* 272 Ga. at 120, 527 S.E.2d at 182–83. Generally, whether to award punitive damages is an issue for the jury. *Read v. Benedict,* 200 Ga.App. 4, 7, 406 S.E.2d 488, 491 (1991).

 Trespass, as an intentional tort, can support a claim for punitive damages. *Tyler,* 272 Ga. at 120, 527 S.E.2d at 183. Further, under 'Georgia law, an action for conversion generally supports punitive damages.' *Amegy Bank Nat'l Ass'n v. Deutsche Bank Alex. Brown,* 619 Fed. Appx. 923, 932 (11th Cir.2015). Given that genuine disputes remain as to Plaintiff's trespass and conversion claims against Defendant AMS, a genuine issue of material

fact also remains as to Plaintiff's punitive damages claim against Defendant AMS. Moreover, viewing the evidence in the light most favorable to Plaintiff, Mr. Aiola's conduct in continuing to remove Plaintiff's belongings from the Property and in continuing to conduct the trash-out despite receiving information indicating that Plaintiff had not abandoned her belongings may be sufficiently culpable to support a punitive damages award. The Court therefore denies this portion of Defendant AMS's Motion for Summary Judgment.

## IV. Conclusion

ACCORDINGLY, the Court **DENIES** Defendant AMS's Motion for Summary Judgment [109].

IT IS SO ORDERED, this the *16th* day of February, 2016.