## A09A0104. SUMMIT AUTOMOTIVE GROUP, LLC v. CLARK et al.
## A09A0105. KIA MOTORS AMERICA, INC. v. CLARK et al.
(681 SE2d 681)

BERNES, Judge.

Southern Georgia Automotive Group, LLC ("Southern Georgia") and its affiliate Southern Georgia Imports, LLC ("Georgia Imports") operated Kia and Mitsubishi automobile dealerships in the Waycross area. The appellees[1] are dissatisfied consumers who

---

[1] The appellees are Ted A. Clark, Jr.; Charles Carter; Harold R. McQuaig; Tina McQuaig; Sonya M. Flener; Amy A. Beverly; Robert E. Scheuing; Carolyn Millhorn; John Bowles; Victoria Bowles; Jennelle D. Noel; George W. Noel; Christian Bloch; Dean C. Cook; Harold Guest; Mona Guest; Dennis Hickox; Lenet Melton; Toni Sweat; Margaret E. Baily; Carson L.

had purchased vehicles from the dealerships. The appellees filed the instant action against Southern Georgia, Georgia Imports, and several of their employees, alleging that the dealerships had failed to pay off outstanding loans on vehicles traded in as part of their respective sales transactions and failed to obtain gap insurance, extended warranty, and life insurance policies that they had purchased during the transactions. Appellees later added as defendants franchisor, Kia Motors of America, Inc.,[2] and the subsequent purchaser of the Kia dealership, Summit Automotive Group, LLC. Appellees alleged that these entities conspired with other named defendants to defraud them. Kia Motors and Summit moved for summary judgment, and the trial court denied both motions. In Case No. A09A0104, we granted Summit's application for interlocutory appeal to review the trial court's decision. In Case No. A09A0105, Kia cross-appeals challenging the denial of its motion. For the reasons that follow, we reverse in both cases.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law. A defendant who will not bear the burden of proof at trial need not affirmatively disprove the nonmoving party's case; instead, the burden on the moving party may be discharged by pointing out by reference to the affidavits, depositions and other documents in the record that there is an absence of evidence to support the nonmoving party's case. If the moving party discharges this burden, the nonmoving party cannot rest on its pleadings, but rather must point to specific evidence giving rise to a triable issue. Our review of the grant or denial of summary judgment is de novo, and we construe the evidence and all inferences therefrom in favor of the nonmoving party.

(Citation omitted.) *DaimlerChrysler Motors Co. v. Clemente*, 294 Ga. App. 38, 38-39 (668 SE2d 737) (2008).

So viewed, the evidence shows that from July 2002 to April 2005, Southern Georgia and its affiliate, Georgia Imports, operated two automobile dealerships commonly known as Kia of Waycross and Waycross Mitsubishi. Southern Georgia's operation of the Kia dealership was authorized by a franchise agreement with Kia Motors.

---

Davis, Sr.; and Mark Coleman.

[2] Mitsubishi Motors of North America, Inc., the other franchisor, was also added as a defendant but was subsequently dismissed without prejudice from the lawsuit.

The franchise agreement set forth the general standards that Southern Georgia was required to meet in its operations and incorporated a Business and Operating Plan that provided average sales performance standards. The franchise agreement also provided for annual performance evaluations and periodic facility evaluations to be conducted jointly by Southern Georgia and Kia Motors. A financial audit of the dealership, conducted in 2003, failed to disclose any problems or errors.

Between October 2002 and October 2004, appellees purchased vehicles from the Kia and Mitsubishi dealerships. As part of the purchase transactions, appellees traded in vehicles that had outstanding liens in favor of third-party creditors. The dealerships agreed to pay off the remaining balances due to the creditors with funds from appellees' purchases, but failed to do so. Several appellees also purchased gap insurance, extended warranties, and/or life insurance as part of their transactions, but the dealerships failed to obtain the policies covering these additional protection plans. The dealerships had been experiencing financial difficulties and did not have adequate funds to cover their operating costs. Rather than paying off the liens on the trade-in vehicles and purchasing the insurance and warranty policies, the dealerships used the funds collected from appellees' transactions to pay the dealerships' financial obligations to their third-party primary lender.

In mid-December, 2004, after appellees discovered the dealerships had not paid off the liens, they filed the instant lawsuit against Southern Georgia, Georgia Imports, their franchisors, and employees. The matter also was reported to the Governor's Office of Consumer Affairs (the "OCA"). On December 22, 2004, the OCA's administrator issued a cease and desist order, finding that the dealerships' conduct in the transactions violated the Georgia Fair Business Practices Act of 1975, OCGA § 10-1-390 et seq. Southern Georgia agreed to comply with the terms of the cease and desist order and entered into a stipulated Assurance of Voluntary Compliance, which provided for Southern Georgia's payment of the trade-in vehicle liens and restitution to the impacted consumers, including appellees.

Thereafter, on December 31, 2004, Southern Georgia entered into an Asset Purchase Agreement whereby it agreed to sell its Kia dealership to Summit. Summit learned of the dealership's failing financial condition and liabilities while performing an in-depth investigation of the dealership in contemplation of its purchase, and appellees' pending lawsuit was disclosed in the agreement. Summit deposited $280,508.12 and Southern Georgia deposited $150,000 pursuant to an escrow agreement and release to pay the obligations under the Assurance of Voluntary Compliance. The closing for

YALE LAW LIBRARY

Summit's purchase of the Kia dealership took place in April 2005 and Summit subsequently took over operations of the dealership.

After Summit purchased the dealership, appellees added Summit as a party defendant to the lawsuit, claiming that it had violated the Georgia Bulk Transfer Act, OCGA § 11-6-101 et seq., and had conspired with Southern Georgia to defraud appellees. Summit denied appellees' claims and filed a motion for summary judgment. Kia Motors, the franchisor for the Kia dealership, also filed a motion for summary judgment. The trial court denied both motions.

### Case No. A09A0104

1. Summit contends that the trial court erred in denying its motion for summary judgment on appellees' claims predicated upon the Georgia Bulk Transfer Act. We agree.

Appellees' amended complaint alleged that Summit's acquisition of Southern Georgia's assets under the asset purchase agreement constituted a bulk transfer, subject to the provisions of the Bulk Transfer Act, OCGA § 11-6-101 et seq. Appellees further alleged that they were creditors entitled to notice of the bulk transfer as required by OCGA §§ 11-6-105 and 11-6-107, and that as a result of Summit's failure to comply with the notice requirements, Summit was liable for the tort claims in this direct action. Appellees' claim, however, fails as a matter of law.

As we have previously held,

> [a]ctions within the scope of the Bulk Transfer Act do not permit direct actions in tort against the transferee. In interpreting an earlier version of the Bulk Transfer Act, we held that its purpose was to protect creditors against fraudulent sales by debtors. More significantly, however, the Bulk Transfer Act preserves a creditor's remedy against the goods, not against the transferee personally.

(Punctuation and footnote omitted.) *Tate v. Kia Autosport of Stone Mountain*, 273 Ga. App. 627, 628 (616 SE2d 112) (2005). See also *Brown Transport Corp. v. Street*, 194 Ga. App. 717, 719-720 (2) (391 SE2d 699) (1990). "[The] Bulk Transfer Act permits only an in rem action against the transferred goods or the proceeds therefrom, not an in personam action against the transferee." *Tate*, 273 Ga. App. at 628-629, n. 6. See also *American Express Co. v. Bomar Shoe Co.*, 125 Ga. App. 408, 409-410 (187 SE2d 922) (1972). Accordingly, appellees may not maintain a direct action against Summit personally or against all of Summit's assets. Id. Because appellees' claim under the Bulk Transfer Act was precluded as a matter of law, summary

judgment in favor of Summit on this ground was required.

2. Summit also contends that it was entitled to summary judgment in its favor as to appellees' claim for conspiracy. Again, we agree.

> A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means. Accurately speaking, there is no such thing as a civil action for conspiracy. . . . Where civil liability for a conspiracy is sought to be imposed, the conspiracy of itself furnishes no cause of action. The gist of the action is not the conspiracy alleged, but the tort committed against the plaintiff and the damage thereby done.

(Citations, punctuation and emphasis omitted.) *First Fed. Sav. Bank v. Hart*, 185 Ga. App. 304, 305 (2) (363 SE2d 832) (1987). The fact of a conspiracy, if proved, makes the act of any one conspirator chargeable to all and allows for the imposition of joint and several liability. *Cook v. Robinson*, 216 Ga. 328, 329 (2), (4) (116 SE2d 742) (1960).

Through their allegations of a conspiracy, appellees attempt to hold Summit jointly liable for Southern Georgia's alleged tortious conduct. Appellees, however, have failed to present any evidence that a conspiracy existed or could be inferred. The undisputed evidence shows that Summit did not make any misrepresentations to appellees or participate in the automobile sales transactions forming the basis of the complaint. All of the appellees' transactions took place prior to the December 31, 2004 Asset Purchase Agreement and the April 2005 closing. In fact, Summit was not even a corporate entity until September 23, 2004, and the majority of appellees' transactions had occurred before that date. The uncontroverted record evidence further establishes Summit did not learn of Southern Georgia's failing financial condition and appellees' claims until the end of December 2004 when it began its in-depth investigation of the dealership in contemplation of its purchase. After learning of appellees' claims and incident to its purchase of the Kia dealership, Summit deposited $280,508.12 into an escrow account established to help resolve and pay the obligations under the OCA's Assurance of Voluntary Compliance. Based upon this evidence, there is no basis for inferring that Summit had knowledge of or participated in a conspiracy to defraud appellees in the complained-of transactions.

Appellees rely solely upon the affidavit of a Summit customer to support their claim of conspiracy. In the affidavit, the customer avers that Summit forged a retail installment contract in connection with a vehicle that he purchased after Summit acquired ownership of the

dealership. But, even assuming that the forgery allegation is true, it does not establish any mutual understanding or concert of action between Summit and the other defendants with regard to appellees.

"[T]he law does not authorize a finding that conspiracy exists merely because of some speculative suspicion," and the mere fact that conspiracy has been alleged does not require submission of the question to a jury where there is no evidence of record to support the claim. *First Fed. Sav. Bank*, 185 Ga. App. at 305-306 (2). Because appellees have failed to present any evidence of a conspiracy between Summit and the other defendants, summary judgment in favor of Summit was required. See id.; *Gators of Tifton v. Stokes*, 186 Ga. App. 912, 914 (368 SE2d 834) (1988).

3. Summit was also entitled to summary judgment in its favor on appellees' claims alleging fraud and violations of Georgia's Racketeer Influenced and Corrupt Organizations ("RICO") statute, OCGA § 16-14-1 et seq.

"In order to prove fraud, the plaintiff must establish five elements: (1) a false representation by a defendant, (2) scienter, (3) intention to induce the plaintiff to act or refrain from acting, (4) justifiable reliance by plaintiff, and (5) damage to plaintiff." (Citation and punctuation omitted.) *DaimlerChrysler Motors*, 294 Ga. App. at 50 (3). In support of their RICO claim, appellees further allege that the defendants had engaged in a pattern of racketeering by having committed the predicate acts of theft by deception and insurance fraud. See OCGA §§ 16-8-3 (a); 16-14-3 (8) (A), (9) (A) (ix) and (xxxvii); 16-14-4; 33-1-9. "Theft by deception is committed when a person obtains property by any deceitful means or artful practice with the intention of depriving the owner of the property." (Citation and punctuation omitted.) *Avery v. Chrysler Motors Corp.*, 214 Ga. App. 602, 603 (1) (448 SE2d 737) (1994). See also OCGA § 16-8-3 (a). In turn,

> [a] person deceives if he intentionally: (1) [c]reates or confirms another's impression of an existing fact or past event which is false and which the accused knows or believes to be false; (2) [f]ails to correct a false impression of an existing fact or past event which he has previously created or confirmed; [or] . . . (5) [p]romises performance of services which he does not intend to perform or knows will not be performed.

OCGA § 16-8-3 (b). See also *Avery*, 214 Ga. App. at 603 (1). A person commits insurance fraud when he "[r]eceives money for the purpose of purchasing insurance and converts such money to such person's own benefit." OCGA § 33-1-9 (a) (2). In this case, appellees have

failed to present any evidence establishing Summit's liability as to any of these claims.

As stated above, the uncontroverted evidence established without question that Summit did not make any misrepresentations to appellees or participate in any of the transactions that form the basis of appellees' claims. All of the alleged acts were perpetrated by Southern Georgia, Georgia Imports, and their employees, and appellees have not presented any evidence that Summit was involved with the operations of the dealerships at the time of these transactions. And, to the extent that appellees seek to hold Summit liable for Southern Georgia's actions in this claim, as stated above, its conspiracy claim fails. Moreover, Summit did not agree to assume liability for Southern Georgia's debts as part of its purchase of the dealerships. The Asset Purchase Agreement specified that Southern Georgia was to "retain and be responsible for all of [its] liabilities and obligations" that accrued or related to the period prior to the April 2005 closing date. Accordingly, there is no basis upon which to impose liability against Summit for these claims.

## Case No. A09A0105

In this cross-appeal, Kia Motors challenges the trial court's denial of its motion for summary judgment. Because appellees failed to present any evidence to create a genuine issue of material fact in support of their claims against Kia Motors, summary judgment in favor of Kia Motors was required. We therefore reverse the trial court's decision.

4. Appellees seek to hold Kia Motors liable for the acts of its franchisee, Southern Georgia, based again on allegations of conspiracy. But, as stated in Division 2 above, appellees were required to prove the existence of a conspiracy and they have failed to do so. *Gators of Tifton*, 186 Ga. App. at 914; *First Fed. Sav. Bank*, 185 Ga. App. at 305-306 (2).

The undisputed evidence establishes that Kia Motors did not have any contact with appellees until after the transactions took place and the problems were reported. Nonetheless, appellees argue that the existence of a conspiracy could be inferred based upon the purported level of Kia Motors's involvement in Southern Georgia's operations. In this regard, appellees rely upon the franchise agreement, which provided that Southern Georgia's Business and Operating Plan was subject to final review and approval by Kia Motors and that annual and periodic performance evaluations of the dealership would be jointly conducted by Kia Motors and Southern Georgia. Notwithstanding appellees' arguments, however, the franchise agreement and Business and Operating Plan merely provided

general standards for the dealership's operations, but did not give Kia Motors authority to control Southern Georgia's daily operations or give Kia Motors involvement in the process of accepting trade-in vehicles or paying the liens on those vehicles. And, nothing in the Business and Operating Plan approved by Kia Motors gave any indication that Southern Georgia and its employees were committing any fraud against its customers. When a financial audit of the dealership was performed at the end of 2003, no problems were discovered or reported at that time. Pertinently, the record evidence shows that the majority of the appellees' transactions took place between March and September 2004 and that the pattern of problems regarding the trade-in vehicles did not become apparent until October or November 2004.[3] Accordingly, contrary to appellees' speculative assertions, there was no evidence indicating that Kia Motors had knowledge of or participated in a conspiracy to defraud appellees in their respective transactions. See *Gators of Tifton*, 186 Ga. App. at 914.

Likewise, there is no merit to appellees' argument that Kia Motors can be deemed to have engaged in a conspiracy based upon its franchisor/franchisee relationship with Southern Georgia in general. A franchisor does not become liable for the acts of its franchisee merely because of the franchisor/franchisee relationship. Rather, to establish a claim against the franchisor for the acts of the franchisee and its employees, appellees must present evidence establishing a claim through some other theory of vicarious or direct liability. See *DaimlerChrysler Motors*, 294 Ga. App. at 44-46 (1). As stated above, appellees have failed to establish their conspiracy claim, and thus, there is no basis to impose liability against Kia Motors under that theory. To the extent that appellees argue that Kia Motors can be held vicariously liable for Southern Georgia's acts, their claim is not supported by the evidence.

"It is well settled that to impose liability on a franchisor for the acts of a franchisee, a plaintiff must show that the franchisor has obligated itself to pay the franchisee's debts or that the franchisee is not a franchisee in fact but a mere agent or alter ego of the franchisor." (Citation, punctuation and footnote omitted.) *Ellison v.*

---

[3] Appellees also rely upon the deposition testimony of Southern Georgia's owner to support their claim of conspiracy. He deposed that a Southern Georgia employee had ongoing dialogue about payoffs and inventories with representatives from Kia Motors. However, no evidence was presented as to the substance of the conversations, including whether the conversations related to *problems or complaints* about payoffs. Nor was any evidence presented as to the time period in which these conversations occurred. As such, this testimony simply does not evidence any agreement between Kia Motors and Southern Georgia to commit fraud or other tortious acts.

*Burger King Corp.*, 294 Ga. App. 814, 820-821 (4) (670 SE2d 469) (2008); *DaimlerChrysler Motors*, 294 Ga. App. at 44-46 (1) (a). It is undisputed that Kia Motors did not obligate itself to pay Southern Georgia's debts. The franchise agreement expressly disclaims any liability for Southern Georgia's debts and provides that Southern Georgia is solely responsible for all liabilities incurred in the conduct of its operations. Accordingly, the validity of appellees' argument seeking to impose liability upon Kia Motors depends upon whether the evidence establishes that Southern Georgia was acting as Kia Motors's agent in the conduct of its operations.

"The test to determine whether an agency relationship exists is whether the contract gives, or the employer assumes, the right to control the time and manner of executing the work, as distinguished from the right merely to require results in conformity to the contract." (Citation and punctuation omitted.) *Ellison*, 294 Ga. App. at 821 (4). The franchisor is permitted to exercise sufficient control over a franchisee to protect the franchisor's national identity and professional reputation, while at the same time forgoing such a degree of control that would make it vicariously liable for the acts of the franchisee. Id. Significantly, in this case, the franchise agreement expressly provides that neither Kia Motors nor Southern Georgia was to serve as the agent or legal representative of the other party for any purpose and did not grant either party authority to assume or create any obligation on behalf of the other. The evidence does not otherwise show that the parties acted contrary to these provisions or that Kia Motors controlled the time, manner, and method of Southern Georgia's daily operations. And, although the franchise agreement set forth general standards to maintain the franchise and provided for evaluations to ensure compliance, "reserving the right to inspect or evaluate a franchisee's compliance with the franchisor's standards and to terminate the franchise for noncompliance is not the equivalent of retaining day-to-day supervisory control of the franchisee's business operations as a matter of law." (Citations and punctuation omitted.) *Pizza K v. Santagata*, 249 Ga. App. 36, 39 (547 SE2d 405) (2001). Moreover, there was no evidence that Kia Motors had control over Southern Georgia's financial expenditures or was involved in the trading in of used vehicles. Under these circumstances, appellees have not demonstrated that Kia Motors can be held vicariously liable for the alleged torts of Southern Georgia and its employees. See *Ellison*, 294 Ga. App. at 820-821 (4); *DaimlerChrysler Motors*, 294 Ga. App. at 44-46 (1) (a); *Pizza K*, 249 Ga. App. at 39.

Likewise there is no basis supporting appellees' argument that Kia Motors ratified the fraudulent acts of Southern Georgia's

employees. Contrary to appellees' argument, the provision in the franchise agreement requiring Southern Georgia to "vigorously and aggressively sell and promote Kia products" did not authorize Southern Georgia to commit fraud. And, "[f]or ratification to occur, the principal must accept and retain the benefits of the unauthorized act." (Citation and punctuation omitted.) *DaimlerChrysler Motors*, 294 Ga. App. at 46 (1) (b). The evidence did not indicate that Kia Motors was benefitted by Southern Georgia's alleged fraudulent acts of using appellees' purchase money to pay Southern Georgia's obligations to the third-party lender. The undisputed evidence shows instead that Kia Motors was not involved with appellees' transactions and did not encourage or approve of Southern Georgia's alleged fraudulent acts. Consequently, no basis has been shown for imposing liability against Kia Motors, and its motion for summary judgment should have been granted. See *DaimlerChrysler Motors*, 294 Ga. App. at 44-46 (1); *Pizza K*, 249 Ga. App. at 39.

*Judgments reversed. Smith, P. J., and Phipps, J., concur.*

DECIDED JULY 10, 2009.

*Dillard, Bower & Crowley, Terry A. Dillard*, for appellant (case no. A09A0104).

*Brown, Readdick, Bumgartner, Carter, Strickland & Watkins, Terry L. Readdick, Steven G. Blackerby*, for appellant (case no. A09A0105).

*Gibson & Spivey, Douglas L. Gibson, Adam Ferrell, Kenneth A. Taft*, for appellees.