**FIRST DIVISION**
**BARNES, P. J.,**
**MCMILLIAN and REESE, JJ.**

**NOTICE: Motions for reconsideration must be physically received in our clerk's office within ten days of the date of decision to be deemed timely filed. http://www.gaappeals.us/rules**

**June 14, 2018**

# In the Court of Appeals of Georgia

A18A0777. NEW STAR REALTY, INC. v. JUNGANG PRI USA, LLC.

BARNES, Presiding Judge.

New Star Realty & Investment, Inc. ("New Star Georgia") was a franchisee of New Star Realty, Inc. ("New Star California"), a residential and commercial real estate and investment business. After the owner and president of New Star Georgia misappropriated escrow funds intended as earnest money for a commercial real estate transaction, Jungang PRI USA, LLC ("Jungang") sued multiple defendants, including New Star California, for negligence and its attorney fees and expenses. Jungang asserted that New Star California was vicariously liable for the acts and omissions of New Star Georgia under theories of actual and apparent agency. Jungang further asserted that New Star California was directly liable for its negligent failure to

properly screen and select the franchise owner and office manager of New Star Georgia, to provide adequate education and training to New Star Georgia, and to properly supervise New Star Georgia's handling of its escrow account.

Following a trial, the jury returned a verdict in favor of Jungang on its negligence claim against New Star California, apportioning 12.5 percent of the fault to New Star California and the remainder of the percentage of fault among other parties. The jury also awarded Jungang its attorney fees and expenses. The trial court thereafter entered judgment in favor of Jungang on its claims for negligence and attorney fees and denied New Star California's motion for judgment notwithstanding the verdict ("j. n. o. v."). On appeal, New Star California contends that the trial court erred in denying its motion for j. n. o. v. because there were no evidentiary or legal grounds for holding it liable for the loss of the escrow funds under theories of actual agency, apparent agency, or direct negligence.[1]

---

[1] This is the second appearance of this case before this Court. We dismissed the first appeal because the original judgment entered by the trial court did not dispose of all the claims to the action or direct entry of final judgment in accordance with OCGA § 9-11-54 (b). See *New Star Realty, Inc. v. Jungang Pri USA, LLC* (Case No. A16A1910, dismissed March 9, 2017). After the dismissal of the first appeal, the trial court entered an amended judgment disposing of all claims, resulting in the present appeal.

2

For the reasons discussed more fully below, we conclude that there was no evidence to support finding New Star California vicariously liable under an actual agency theory in light of its franchise relationship with New Star Georgia and its lack of supervisory control over the latter's daily operations. Nor was there evidence sufficient to hold New Star California vicariously liable under an apparent agency theory, given that Jungang failed to show that it justifiably relied on the apparent agency relationship and that its reliance led to its injury. Lastly, New Star California could not be held liable under a direct negligence theory because Jungang failed to show the existence of a legal duty that would support such a claim in this context. Accordingly, we reverse the trial court's denial of New Star California's motion for j. n. o. v. and remand with the direction that the trial court enter judgment in favor of New Star California on Jungang's claims for negligence and attorney fees.

"On appeal from the denial of a motion . . . for j. n. o. v., we construe the evidence in the light most favorable to the party opposing the motion, and the standard of review is whether there is any evidence to support the jury's verdict." (Citation and punctuation omitted.) *Legacy Academy v. Doles-Smith Enterprises*, 337 Ga. App. 575, 576 (789 SE2d 194) (2016). So viewed, the evidence showed that New

3

Star California was a real estate company organized in California that was well-known in the Korean-American community. New Star California was owned by Christopher Nam, and the chief executive officer ("CEO") position alternated between Nam and his wife. New Star California had offices throughout the United States that were either directly owned by the company or were structured as franchises.

In 2006, New Star California entered into a franchise agreement with New Star Georgia. The franchise agreement granted New Star Georgia the exclusive right in Georgia to use New Star California's brand name, logo, and proprietary business system in representing clients in commercial and residential real estate transactions. The agreement further provided that New Star California would provide marketing and advertising support to New Star Georgia, would provide referrals to New Star Georgia through its franchisee network, and would permit New Star Georgia to use its website for an additional user fee. Although the agreement also stated that New Star California would visit "every area once every year" to hold a convention and seminar for education purposes, a subsequent paragraph of the agreement stated that, "[c]onsidering the differences in the state laws of California and Georgia[,] scheduled

4

education will not be implemented" and specific requests for education instead would have to be made by New Star Georgia.

The franchise agreement required New Star Georgia to pay New Star California a franchise initiation fee. New Star Georgia also had to pay New Star California a royalty for real properties that it sold, and it was obligated to comply with the articles of incorporation and bylaws of New Star California. New Star California was authorized to audit New Star Georgia's books periodically to verify that all contractual fees had been correctly determined, and New Star Georgia had to periodically report its real estate transactions to New Star California. However, the agreement provided that New Star California was "not responsible for the financial loss and legal damages of the business owned by [New Star Georgia]" and that "all responsibilities of [New Star Georgia's] business operation including legal damages, E&O responsibilities, etc. shall be the responsibility of [New Star Georgia]."

The franchise agreement had an initial five year term, subject to automatic renewal for additional terms unless terminated by one of the parties. New Star California also reserved the right to change the terms of the franchise agreement upon six months advance notice, but if the parties could not "come to terms" regarding the

5

change, the agreement would be terminated. New Star Georgia also had the right to terminate the agreement if certain notice requirements were met.

At its peak, New Star Georgia had approximately 50 real estate agents. One of the top-selling agents was Jueun Yeo, who also served as New Star Georgia's senior vice president. In addition to her positions at New Star Georgia, Yeo had a small ownership interest in and was a managing member of a real estate investment company, Jungang. Jungang's other owners were Yeo's brother, who lived in Korea, and a company affiliated with Yeo's brother.

Jeongha Lee was the owner and president of New Star Georgia. In November 2007, during a New Star Georgia office meeting, Lee informed Yeo and several other agents that a 150 acre parcel of land across from the Kia Motor plant in West Point, Georgia, was on sale for $23.5 million. Lee advised Yeo and the other agents that the land was a good opportunity for development. Lee also told Nam, the owner of New Star California, about the West Point investment opportunity when he attended the annual holiday meeting with other franchise owners in California in December 2007, and Lee gave an update to Nam when he visited Georgia in March 2008.

After investigating the West Point property, Yeo talked with her brother, who agreed with her that Jungang should invest in the deal. Yeo, acting as the buyer's agent for Jungang, learned from Lee that the draft purchase and sale agreement for the West Point property required an earnest money deposit of $1 million and that the closing of the deal was set to occur in the first week of January 2008. On November 26, 2007, Lee wrote Jungang regarding the need for an earnest money deposit before the closing, representing that "[t]his is to assure you that your money will be securely deposited in our escrow account. We have about 45 days left before closing. If any reason, we don't close on this project for what so ever reason it will be fully refundable to you." Lee later added a postscript stating, "The earnest money can not be transferred to any other account without Jungang PRI USA's approval." On November 26, 2007, Lee also sent an e-mail to Yeo which, as translated from the Korean language, provided that: "The contract fund of 1 Million dollars will be kept at our trust account for safety and security, and for about 45 days of contract period, I repeat that the contract fund will be returned. Since the trust account is safe, (you) don't need to worry about anything else." Based on those assurances from Lee, on November 29, 2007, Jungang, through Yeo, wired the $1 million in earnest money

7

to New Star Georgia's escrow account. At the time of the wire transfer, a purchase and sale agreement for the West Point property had not been executed, but Yeo trusted Lee when he said that the deal would either close or the wired escrow funds would be returned.

Paul Rohrabaugh, who was the licensed qualifying broker for New Star Georgia in November and December 2007,[2] was responsible for ensuring that the company was in compliance with Georgia real estate law.[3] An expert in the field of commercial real estate, including broker responsibilities and handling of escrow funds, testified that the qualifying broker is responsible for the real estate firm's escrow account and that, if another person had the authority to write checks from the account, an ordinarily careful broker also would want to be a signatory and would implement procedures for ensuring that escrow account disbursements were proper. In the case of New Star Georgia, however, Rohrabaugh was not a required signatory

---

[2] Rohrabaugh served as the qualifying broker for New Star Georgia until December 29, 2007, when Lee's wife became the qualifying broker.

[3] Georgia law requires that, to be licensed, a real estate firm must "designate[] an individual licensed as a broker as its qualifying broker who shall be responsible for assuring that the firm and its affiliated licensees comply with the provisions of this chapter and its attendant rules and regulations." OCGA § 43-40-10.

8

on the escrow account, and he did not establish or implement any policies related to the account.

After transferring $1 million of Jungang's funds into the escrow account, Yeo never received a copy of a purchase and sale agreement from the seller, and the closing did not occur by January 2008. Yeo asked Lee regularly about the status of the deal, which Lee maintained had been delayed, and in June 2008, Yeo asked Lee for the return of Jungang's earnest money. Lee assured her that the deal would close. Subsequently, after Yeo asked again for the return of Jungang's funds, Lee told her that the deal would close by August 31, 2008. Yeo spoke with her brother, who advised that they could wait until then for the deal to close.

Meanwhile, unbeknownst to Yeo, Lee had transferred all of the earnest money out of the escrow account in December 2007 and then had spent the funds on a "land development deal." Rohrabaugh was unaware of the $1 million in earnest money transferred in and out of the escrow account. Rohrabaugh never reviewed the bank statements that reflected the transactions, and he did not ask questions about the escrow account because he believed that New Star Georgia's office manager was overseeing the account.

Yeo acknowledged at trial that, by August 2008, Lee had informed her that the escrow funds were "gone." Yeo testified that she was initially shocked by Lee's revelation, but that she came to the conclusion that he must be bluffing in an effort to keep Jungang in the deal because, she testified, "there is a broker who's taking care of the escrow account." Additionally, on August 13, 2008, Yeo executed a new agreement on behalf of Jungang regarding the West Point property, but with Lee in his personal capacity rather than with New Star Georgia. Under the new agreement, "the ownership of the whole project" would be restructured, and Yeo would receive 40 percent of the listing agent's commission and the entire buyer's agent commission if the closing on the West Point property occurred, and Jungang ultimately would own 20 percent of the project as an investor. The new agreement provided that it would be "null and void" if the closing on the West Point property did not occur by August 31, 2008.

The deal did not close in August 2008. Yeo spoke by phone with Nam and his wife in California and complained to them that Lee had removed Jungang's funds from the escrow account without permission. Nam called Lee in August or September

2008 to inquire about the escrow account and advised him that he should return the funds to Jungang. Lee responded that he would handle the problem.

Yeo sent Nam an e-mail on December 8, 2008, again explaining the situation with the escrow account. On December 14, 2008, Nam forwarded Yeo's email to the director of franchise operations with the message: "Find out what this is about. Don't hurt people's feelings[.] Also don't reveal who did this." New Star California subsequently terminated its franchise agreement with New Star Georgia at the end of 2008, and New Star Georgia thereafter ceased all business operations.

Jungang's attorney sent a demand letter to New Star Georgia for the return of the escrow funds. However, Jungang's money was never returned, and Lee was later convicted of felony theft by taking, sentenced to a term of ten years in confinement, and ordered to pay $1 million in restitution to Jungang. As of the underlying trial date, Lee had not paid the ordered restitution.

On November 18, 2011, Jungang filed a complaint, which it later amended, against several defendants, including Rohrabaugh, New Star Georgia, and New Star California. Jungang asserted various causes of action against New Star California, including negligence, and sought $1 million in damages for the unreturned escrow

funds as well as attorney fees and expenses of litigation under OCGA § 13-6-11. At the ensuing jury trial, Jungang alleged that New Star California was vicariously liable for the negligence of New Star Georgia relating to the escrow funds under theories of actual and apparent agency. Jungang also alleged that New Star California was directly liable for its negligent failure to adequately screen and select Lee as the franchise owner of New Star Georgia, to adequately screen and hire the office manager of New Star Georgia, to provide sufficient education and training to New Star Georgia, and to properly supervise New Star Georgia's handling of the escrow account.

Following the presentation of Jungang's case at trial, New Star California moved for directed verdict, which the trial court denied. After the close of evidence, the jury, through a special verdict form, found in favor of Jungang on its negligence claim against New Star California in the amount of $1 million,[4] and the jury allocated

---

[4] The jury found (i) in favor of New Star California on Jungang's breach of contract claim, (ii) in favor of Jungang in its negligence per se claim against Rohrabaugh but awarded zero damages, (iii) in favor of Jungang in its negligence claim against Rohrabaugh and awarded $1,000,000 in damages, and (iv) in favor of Jungang in its breach of contract claim against New Star Georgia but awarded zero damages.

12

12.5 percent of the fault to New Star California.[5] The jury also awarded Jungang $200,000 on its claim against New Star California for attorney fees and expenses under OCGA § 13-6-11. The trial court thereafter entered judgment on the verdict and denied New Star California's motion for j. n. o. v. Upon the trial court's entry of an amended judgment, New Star California filed this appeal.

1. New Star California contends that the trial court erred in denying its motion for j. n. o. v. on Jungang's negligence claim. As we have explained,

> [a] franchisor does not become liable for the acts of its franchisee merely because of the franchisor/franchisee relationship. Rather, to establish a claim against the franchisor for the acts of the franchisee and its employees, appellees must present evidence establishing a claim through some other theory of vicarious or direct liability.

*Summit Automotive Group v. Clark*, 298 Ga. App. 875, 882 (4) (681 SE2d 681) (2009). New Star California contends that there was no evidence to support finding it vicariously liable for the acts or omissions of New Star Georgia relating to the escrow funds under theories of actual or apparent agency. New Star California further contends that as a matter of law, it owed no legal duty to Jungang that would support

---

[5] The jury apportioned the remainder of the percentage of fault to Jungang, Lee, Lee's wife, and Rohrabaugh.

13

a direct negligence claim against it pertaining to the escrow funds. We will discuss these theories of liability each in turn.

(a) *Actual Agency.* "The relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1. "The historical test applied by Georgia courts has been whether the contract gives, or the employer assumes, the right to control the time and manner of executing the work, as distinguished from the right merely to require results in conformity to the contract." (Citations and punctuation omitted.) *McMullan v. Ga. Girl Fashions*, 180 Ga. App. 228, 230 (2) (348 SE2d 748) (1986). See *Pizza K v. Santagata*, 249 Ga. App. 36, 38 (547 SE2d 405) (2001) (agency relationship requires that alleged principal "exercise supervisory control over the daily activities of . . . employees"). Hence, to prove that New Star Georgia was New Star California's agent, Jungang was required to show that New Star California controlled the time, manner, and method of New Star Georgia's day-to-day operations. *DaimlerChrysler Motors Co. v. Clemente*, 294 Ga. App. 38, 44 (1) (a) (668 SE2d 737) (2008).

> In applying this test, we must be mindful of the special relationship
> created by a franchise agreement, for a franchisor is faced with the

14

problem of exercising sufficient control over a franchisee to protect the franchisor's national identity and professional reputation, while at the same time foregoing such a degree of control that would make it vicariously liable for the acts of the franchisee and its employees. Given this special relationship, we have held that a franchisor may protect its franchise and its trade name by setting standards governing its franchisee's operations, and these standards may be quite detailed, specific, and strict. Moreover, the fact that a franchise agreement authorizes periodic inspections of the franchise and gives the franchisor the right to terminate the agreement for noncompliance is not enough to prove an agency relationship.

(Citation and punctuation omitted.) Id. at 44-45 (1) (a).

Mindful of these principles, we conclude that the evidence adduced at trial did not support a finding of an agency relationship between New Star California and New Star Georgia. While the franchise agreement between New Star California and New Star Georgia authorized New Star California to audit New Star Georgia to ensure the proper determination of contractual fees, required New Star Georgia to periodically report its real estate transactions to New Star California, and permitted New Star California to terminate the franchise, the agreement contained no provisions giving New Star California supervisory control over the day-to-day activities of New Star Georgia. To the contrary, the franchise agreement expressly stated that "all

15

responsibilities of [New Star Georgia's] business operation . . . shall be the responsibility of [New Star Georgia]." Additionally, New Star Georgia's office manager testified that New Star California did not provide an operations manual to New Star Georgia and had no involvement in its daily operations. And Nam, the owner of New Star California, testified that each of New Star California's franchises operated on its own, that New Star California did not have supervisory control over the hiring and firing of franchise employees or when particular offices are open, and that New Star California did not instruct New Star Georgia on a day-to-day basis. Finally, the evidence established without contradiction that New Star California did not exercise supervisory control over New Star Georgia's escrow account, and, in fact, Nam did not know that New Star Georgia had such an account until after Lee misappropriated Jungang's funds.

It is true, as Jungang points out, that Lee testified that as owner and president of New Star Georgia, he took his "marching orders" from New Star California. But, as examples, Lee only pointed to requirements that New Star Georgia use New Star California prescribed uniform, logo, brand of real estate agents' cars, advertising, and sales and marketing methods. A franchisor's exercise of its "right to protect and

16

control its trade name and good will does not equate to managing the daily operations of [a franchisee's] business." *Cotton States Mut. Ins. Co. v. Kinzalow*, 280 Ga. App. 397, 402 (634 SE2d 172) (2006) (franchisor's advertising restrictions and oversight and control over the use of its "name, trademark, or logo" by franchisees does not constitute day-to-day supervisory control over those franchisees). See *Frey v. PepsiCo*, 191 Ga. App. 585, 587 (1) (382 SE2d 648) (1989) (use of franchisor's trademark on vehicles and uniforms insufficient to demonstrate agency relationship). Furthermore, the fact that a franchisor establishes mandatory operating standards to ensure uniformity and quality among its franchises does not amount to day-to-day supervisory control over the franchisee. See *McKee Foods Corp. v. Lawrence*, 310 Ga. App. 122, 125 (712 SE2d 79) (2011) (franchisor's setting of detailed standards regarding delivery and service is not the equivalent of exercising day-to-day supervisory control over the franchisee); *Schlotzsky's, Inc. v. Hyde*, 245 Ga. App. 888, 889-890, (538 SE2d 561) (2000) (franchisor's detailed mandatory standards regarding "service quality" failed to demonstrate that franchisor retained the right to control the time, manner, or method in which the franchisee's employees carried out those standards). Additionally, when asked about New Star California's decision-

making authority, Lee clarified that individual franchisees could get help and advice, but that franchisees "have their own decision[s] to make," and that New Star California did not have to approve individual real estate deals before New Star Georgia could accept them.

Under these circumstances, the evidence of record, even when construed in favor of New Star Georgia, failed to support a finding that New Star California controlled the time, manner, and method of New Star Georgia's daily operations. See *DaimlerChrysler Motors Co.*, 294 Ga. App. at 44-45 (1) (a). Accordingly, because New Star California "did not reserve itself the right to control the time, manner, or method in which [New Star Georgia,] through its employees, actually executed" the terms of the franchise agreement, there was no evidence that New Star Georgia was an actual agent of New Star California for purposes of vicarious liability. *Kids R Kids Intl. v. Cope*, 330 Ga. App. 891, 893-894 (1) (769 SE2d 616) (2015).[6]

---

[6] "Alternatively, a franchisor can be held liable for the acts and omissions of its franchisee if the franchisor has by some act or conduct obligated itself to pay the debts of the franchisee." (Citation and punctuation omitted.) *DaimlerChrysler Motors Co.*, 294 Ga. App. at 45 (1) (a). However, there is no evidence that New Star California ever obligated itself to pay the debts of New Star Georgia; rather, it expressly disclaimed any responsibility for the "financial loss and legal damages" of its franchisees in the franchise agreement.

(b) *Apparent Agency.* Jungang also sought to hold New Star California vicariously liable for New Star Georgia's acts and omissions relating to the escrow account under the doctrine of apparent agency.

> In order to recover under a theory of apparent or ostensible agency, a plaintiff must establish three elements: (1) that the alleged principal held out another as its agent; (2) that the plaintiff justifiably relied on the care or skill of the alleged agent based upon the alleged principal's representation; and (3) that this justifiable reliance led to the injury.

(Footnote and punctuation omitted.) *Kids R Kids Intl.*, 330 Ga. App. at 894 (2).

In the present case, Lee testified that Nam directed franchisees to "try to make [the general public] believe" that New Star Georgia and New Star California were "the same company." New Star California required franchisees to use its logo, and Nam testified that in the Korean language, the names of New Star California and New Star Georgia were referenced the same. Additionally, the web pages for New Star Georgia on the New Star California website identified Nam as CEO and referred to New Star Georgia simply as the "branch" that was the "Atlanta, Ga. Office." Given this record, there was evidence to support a finding that New Star California held New Star Georgia out to the general public as its apparent agent. See *Watson v. Howard Johnson Franchise Systems*, 216 Ga. App. 237, 238 (453 SE2d 758) (1995)

19

(issue of fact existed as to whether franchisor held out franchisee as its apparent agent, where franchisee's billboards suggested that franchisee was operated by the franchisor, the franchise agreement required the franchisor's approval of any advertising, and the franchisor was aware of the billboards).

Nevertheless, to hold New Star California vicarious liable based on apparent agency, Jungang also was required to show that it justifiably relied on the apparent agency relationship and that its reliance caused its injury. *Kids R Kids Intl.*, 330 Ga. App. at 894 (2). The evidence failed to show that either of these requirements was met in the present case. Notably, the uncontroverted evidence showed that Jungang acted through its owner and agent Yeo, who also was a vice president and real estate agent for New Star Georgia. Yeo thus was a dual agent of Jungang and New Star Georgia, and "the knowledge of a dual agent is imputable to both principals." *Carlton* v. *Moultrie Banking Co.*, 170 Ga. 185, 186 (3) (152 SE 215) (1930) (syllabus by court). See *First American Title Ins. Co. v. DJ Mtg.*, 328 Ga. App. 249, 255 (1) (761 SE2d 811) (2014) (applying dual agent rule in context of alleged apparent agency relationship). The evidence further reflects that Yeo was aware that New Star Georgia had a franchise arrangement with New Star California and paid a franchise fee to it,

20

that New Star California did not issue her paycheck, and that she did not interview with New Star California before she was hired by New Star Georgia. Given Yeo's knowledge about the relationship between New Star California and New Star Georgia, Jungang, to whom Yeo's knowledge was imputed, was not in the same position as the general public.

Despite her knowledge of the franchise arrangement, Yeo testified at trial that she thought that New Star Georgia and New Star California were the "same company." However, "[i]t is not enough that plaintiff simply believe there is an agency relationship. [It] is an objective standard." *Richmond County Hosp. Auth. v. Brown*, 257 Ga. 507, 508-509 (361 SE2d 164) (1987). "This means that a person dealing with an apparent agent must exercise due diligence to ascertain the relationships involved. This is especially true with respect to real estate transactions." (Footnotes omitted.) Charles R. Adams III, Ga. Law of Torts §9.7 (database updated December 2017). See *Marcoux v. Northside Realty Assoc.*, 207 Ga. App. 99, 100 (1) (427 SE2d 72) (1993). Here, given that Yeo knew that New Star Georgia had a franchise arrangement with New Star California and that hiring and pay decisions were made by New Star Georgia, if Yeo was unsure of the exact relationship between

21

the parties, she should have inquired further before investing in the West Point property on Jungang's behalf, but there is no evidence that she made any effort to do so in this case. Thus, even if there was evidence that New Star California held out New Star Georgia to the general public as its apparent agent through its logo and website, Jungang could not demonstrate justifiable reliance in light of the uncontroverted evidence that Yeo knew of the franchise arrangement and failed to exercise due diligence in further investigating the relationship between the parties. See *Kids R Kids Intl.*, 330 Ga. App. at 895 (2) (plaintiff could not prove justifiable reliance, given her knowledge that daycare center was a franchise); *Marcoux*, 207 Ga. App. at 100 (1) (property owner could not hold realty company liable under apparent agency theory where, among other things, owner had "time to examine the relationships of the players in the scene").

Additionally, based on the evidence presented at trial, Jungang failed to show that it relied on an apparent agency relationship between New Star California and New Star Georgia in its decision to invest in the West Point property, and thus failed to show that any reliance by Jungang led to its injury. The evidence reflects that Jungang acted through Yeo in deciding to invest in the West Point property, and the

availability of that property came to Yeo's attention at a New Star Georgia office meeting conducted by Lee. Yeo then traveled to where the property was located and investigated the zoning of the land, the demographics of the area, the potential locations for a road, traffic signals, water and sewer lines, and the development plans of Kia Motors. Yeo believed that it was a good investment principally based on her familiarity and trust in the Kia brand. And, at trial, Yeo acknowledged that New Star California had nothing to do with her decision to proceed on behalf of Jungang with the investment in the West Point property. The evidence in this case therefore failed to show that Jungang's injury was caused by its reliance on an apparent agency relationship between New Star California and New Star Georgia. It follows that New Star California could not be held vicariously liable for the loss of the escrow funds based on an apparent agency theory, "inasmuch as it requires reliance on the apparent agency relationship." *Frey*, 191 Ga. App. at 587 (1). See *Fortune v. Principal Financial Group*, 219 Ga. App. 367, 370 (1) (465 SE2d 698) (1995) (plaintiffs could not recover under an apparent agency theory, where uncontroverted evidence showed that plaintiffs made the investment at issue for reasons other than reliance on any apparent agency relationship between insurance company and independent insurance

broker); *Richmond County Hosp. Auth.*, 257 Ga. at 509 (noting that"justifiable reliance must lead to the injury" for a defendant to be held liable under an apparent agency theory).

(c) *Direct Negligence.* Jungang alternatively maintained that New Star California was directly liable for the loss of the escrow funds because it failed to exercise ordinary care in the screening and selection of Lee as a franchisee owner and in the hiring of New Star Georgia's office manager; failed to provide adequate education and training to New Star Georgia; and failed to properly supervise New Star Georgia's handling of its escrow account.

"It is well established that to recover for injuries caused by another's negligence, a plaintiff must show four elements: a duty, a breach of that duty, causation and damages." (Citation and punctuation omitted.) *Johnson v. American Nat. Red Cross*, 276 Ga. 270, 272 (1) (578 SE2d 106) (2003). "The threshold issue in any cause of action for negligence is whether, and to what extent, the defendant owes the plaintiff a duty of care." (Citation and punctuation omitted.) *DaimlerChrysler Motors Co.*, 294 Ga. App. at 47 (2).

> No matter how innocent the plaintiff may be, [the plaintiff] is not entitled to recover unless the defendant did something that it should not

24

have done, or failed to do something that it should have done pursuant to the duty owed the plaintiff. A legal duty sufficient to support liability in negligence is either a duty imposed by a valid statutory enactment of the legislature or a duty imposed by a recognized common law principle declared in the reported decisions of our appellate courts. Whether a legal duty exists is a question of law for the court.

(Footnotes and punctuation omitted.) *Rasnick v. Krishna Hospitality*, 302 Ga. App. 260, 263 (1) (690 SE2d 670) (2010). Applying these principles, we conclude that Jungang failed to demonstrate that a legal duty existed in this case sufficient to support liability against New Star California under a direct negligence theory.[7]

---

[7] The trial court relied upon OCGA § 51-1-2 as the basis for Jungang's negligence claim against New Star California. See OCGA § 51-1-2 ("In general, ordinary diligence is that degree of care which is exercised by ordinarily prudent persons under the same or similar circumstances. . . . The absence of such diligence is termed ordinary negligence."). OCGA § 51-1-2, however, simply defines ordinary negligence; it does not itself create a substantive legal duty. Cf. *Landis v. Rockdale County*, 206 Ga. App. 876, 879 (2) (427 SE2d 286) (1992) ("OCGA §§ 51-1-1 and 51-1-6 . . . merely define a tort and authorize damages when a legal duty is breached. Neither creates a legal duty substantively."). It is true that there is a "general duty one owes to all the world not to subject them to an unreasonable risk of harm." (Footnote and punctuation omitted.) *Weller v. Blake*, 315 Ga. App. 214, 219 (2) (726 SE2d 698) (2012). But, that potentially broad duty is narrowed by the general rule that "a person does not have a duty to control the conduct of another person, who is a potential tortfeasor, so as to prevent that person from harming a third person," absent a special relationship. *Ihesiaba v. Pelletier*, 214 Ga. App. 721, 724-725 (3) (448 SE2d 920) (1994). And, a franchisor-franchisee relationship, without more, does not create such a special relationship. See *Summit Automotive Group*, 298 Ga. App. at 882 (4) (noting

(i) *Negligent Selection of Franchisee Owner.* While Jungang sought to hold New Star California directly liable for its selection of Lee as a franchisee owner, Jungang has failed to identify any Georgia statute or common law principle reflecting that a franchisor owes a legal duty to third parties in its selection of its franchisee owners. Under Georgia law, an employer has a legal duty to exercise ordinary care in the selection of its own employees. See OCGA § 34-7-20 ("The employer is bound to exercise ordinary care in the selection of employees and not to retain them after knowledge of incompetency . . . ."); *Doe v. Young Women's Christian Assn. of Greater Atlanta*, 321 Ga. App. 403, 408 (1) (740 SE2d 453) (2013) ("An employer has a duty to exercise ordinary care not to hire or retain an employee the employer knew or should have known posed a risk of harm to others where it is reasonably foreseeable that the employee's tendencies could cause the type of harm sustained by the plaintiff."). Lee, however, was not an employee of New Star California; as previously discussed, he was the owner of a separate business that entered into a

---

that "[a] franchisor does not become liable for the acts of its franchisee merely because of the franchisor/franchisee relationship"). Thus, Jungang had to rely on some other, more specific statutory or common law duty as a basis for its direct negligence claim against New Star California, as discussed infra.

26

franchise agreement with New Star California. In light of this record, Jungang cannot show that New Star California owed a legal duty under Georgia statutory or common law to exercise ordinary care in its selection of Lee as a franchise owner. See, e.g., *Finley v. Lehman*, 218 Ga. App. 789, 791 (2) (463 SE2d 709) (1995) (tort theory of negligent hiring generally does not apply to selection of independent contractor); *Mason v. Gracey*, 189 Ga. App. 150, 154 (1) (c) (375 SE2d 283) (1988) (OCGA § 51-2-5 imposes a duty to exercise ordinary care in hiring of employees, not independent contractors), disapproved in part on other grounds by *Colquitt v. Rowland*, 265 Ga. 905, 907 (2), n. 1 (463 SE2d 491) (1995).

Nonetheless, even if New Star California owed a legal duty to third parties to exercise ordinary care in the selection of its franchisee owners, there is no evidence in this case that it knew or should have known that Lee had the criminal propensity to misappropriate client funds. As we have explained in the employer-employee context, "[a]n employer's liability for negligent hiring . . . of an employee requires proof that the employer knew or should have known of the employee's violent and criminal propensities." (Citation and punctuation omitted.) *Hardison v. Enterprise Rent-A-Car*, 331 Ga. App. 705, 707 (771 SE2d 402) (2015). "[I]t is not necessary that

27

the employer should have contemplated or even be able to anticipate the particular consequences which ensued, or the precise injuries sustained by the plaintiff," but "a plaintiff must produce some evidence of incidents similar to the behavior that was the cause of the injury at issue." (Citations and punctuation omitted.) *Remediation Resources v. Balding*, 281 Ga. App. 31, 34 (2) (635 SE2d 332) (2006).

In the present case, the evidence reflected that New Star California knew that many of the franchisee owners it selected were unsuccessful in their prior business endeavors and were not business savvy, and Lee was not himself a licensed real estate broker or real estate agent. Viewing this evidence in a light most favorable to Jungang, Jungang demonstrated that New Star California should have reasonably foreseen that Lee might not succeed as a franchise owner, but not that New Star California should have reasonably foreseen that Lee would engage in criminal misconduct, such as the theft of client funds. Given that there was no evidence that New Star California had actual or constructive knowledge of Lee's propensity to engage in theft or other criminal conduct, Jungang could not succeed on its claim that New Star California was negligent in its selection of Lee as the owner of New Star Georgia, even if we were to assume it owed a legal duty to exercise ordinary care in

28

its selection of its franchisee owners. See *Ga. Messenger Svc. v. Bradley*, 302 Ga. App. 247, 250 (2) (a) (690 SE2d 888) (2010); *Kemp v. Rouse-Atlanta, Inc.*, 207 Ga. App. 876, 878 (1) (429 SE2d 264) (1993); *Kelley v. Baker Protective Svcs.*, 198 Ga. App. 378, 379-380 (401 SE2d 585) (1991).

(ii) *Negligent Hiring, Training, and Supervision of Franchisee.* Jungang also sought to hold New Star California directly liable for its alleged failure to exercise ordinary care in the hiring of New Star Georgia's office manager, in the education and training it provided to New Star Georgia, and in its supervision over New Star Georgia's handling of the escrow account. But, there can be no claim for negligent hiring, training, and supervision of certain individuals where, as here, the defendant was not the employer of those individuals. See *Cobra 4 Enterprises v. Powell-Newman*, 336 Ga. App. 609, 615 (3), n. 4 (785 SE2d 556) (2016) (plaintiff could not succeed on negligent hiring, retention, and supervision claims, given that the defendant was not the employer of the driver who injured the plaintiff).

It is true that a franchisor can be held liable for the negligent training and supervision of franchisee employees under certain circumstances if the franchisor undertook a duty to involve itself in the day-to-day operations of the franchisee or

29

assumed the right to control the manner in which the franchisee executed its work. See *Hyde v. Schlotzsky's, Inc.*, 254 Ga. App. 192, 193 (561 SE2d 876) (2002). See also *Milwaukee Area Technical College v. Frontier Adjusters of Milwaukee*, 752 NW2d 396, 405 (III) (Wis. App. 2008) ("[A] franchisor is not liable under a negligent supervision theory unless it had the right to supervise the internal operations of the franchise.") (citation and punctuation omitted). However, as explained supra in Division 1 (a), the evidence in this case failed to show that New Star California exercised control over New Star Georgia's daily operations, and thus Jungang could not succeed on its negligent training and supervision claims. See *Hyde*, 254 Ga. App. at 193 (restaurant franchisor could not be held liable for alleged negligence in training, supervision, and inspection of franchisee, where there was no evidence franchisor "undertook a duty to involve itself in the day-to-day operation of the restaurant or that it assumed the right to control the manner of executing the work in the restaurant").[8]

---

[8] Jungang relies on *Johns v. Marlow*, 252 Ga. App. 79 (555 SE2d 756) (2001) in an effort to support its direct negligence claim against New Star California, but that case is inapposite factually and legally. *Johns* involved horses breaking through a gate and injuring a motorcyclist driving on a public road. Id. at 79-80. And, the negligence claim in *Johns* was predicated on a statute (OCGA § 4-3-3) that imposed a duty on owners to keep their livestock off of the public roads. See id. at 80. Here,

In sum, for the combined reasons set forth in Division 1 (a) - (c), Jungang's negligence claim against New Star California, whether predicated on a theory of vicarious or direct liability, failed as a matter of law. Consequently, the trial court should have granted New Star California's motion for j. n. o. v. on that claim.

2. Because Jungang could not prevail on its negligence claim again New Star California, it likewise could not succeed on its claim for attorney fees and expenses under OCGA § 13-6-11. See *Kammerer Real Estate Holdings v. Forsyth County Bd. of Commrs.*, 302 Ga. 284, 287 (4) (806 SE2d 561) (2017) ("[A] claim for attorney fees under OCGA § 13-6-11 is a derivative claim."); *DaimlerChrysler Motors Co.*, 294 Ga. App. at 52 (5) (attorney fees claim failed as a matter of law where plaintiff could not succeed on any underlying tort claim). The trial court thus should have granted New Star California's motion for j. n. o. v. on Jungang's attorney fees claim.

3. In light of our decision in Divisions 1 and 2, we need not address New Star California's remaining enumeration of error pertaining to prejudgment interest.

---

in contrast, Jungang has failed to point to a statute imposing a duty on New Star California regarding the selection of its franchise owners or the hiring, training, and supervision of its franchisees.

*Judgment affirmed. Reese, J., concurs fully. McMillian, J., concurs fully in Divisions 1 (a) and 1 (c) (ii), 2, and 3, and in judgment only in Division 1 (b) and 1 (c) (i).\**

**\*DIVISION 1 (b) and (c) (i) OF THIS OPINION IS PHYSICAL PRECEDENT ONLY. SEE COURT OF APPEALS RULE 33.2 (a).**